[Cite as *In re R.A.*, 2022-Ohio-1748.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

In re R.A.

Court of Appeals No.  E-21-048
E-21-049

Trial Court No.  2018 JD 010
2018 JN 034

**DECISION AND JUDGMENT**

Decided:  May 25, 2022

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Ron Nisch, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} In this consolidated appeal, N.M., the mother and appellant herein, appeals

two final judgments of the Erie County Court of Common Pleas, Juvenile Division that

terminated her parental rights and granted permanent custody of her two children to the Erie County Department of Job and Family Services ("the Agency"). For the following reasons, we affirm.

**Statement of the Case**

{¶ 2} Appellant, N.M. ("Mother"), is the mother of two children, a daughter and a son. On April 19, 2018, the Agency filed a complaint alleging that the daughter was a neglected/dependent child due to concerns that she was not meeting developmental milestones, had significant delays, was suffering from a severe case of cradle cap, and had missed medical appointments. On May 31, 2018, the Agency filed a complaint alleging that the son was also a dependent child. At the time, the children were residing at 1423 North Forrest Drive in Sandusky, Ohio with Mother and her boyfriend, M.A. ("Father"), who is their biological father. J.M., the legal father of the children, who was married to Mother when she gave birth to them, has never had any involvement with the children.

{¶ 3} At adjudicatory hearings, held on June 12 and 26, 2018, Mother admitted to the dependency allegations. The Agency was awarded protective supervision over the children at the dispositional hearings in their respective cases. The Agency soon became concerned about the size of the children, and the ongoing caseworker requested that Peds on Wheels, a pediatric medical services provider, meet her at the family's home. After examining the children, the Peds on Wheels physician instructed the caseworker to take

2.

the children directly to Firelands Hospital. At Firelands Hospital, both children were examined and the son was given an IV. Thereafter, the children were transferred to Rainbow Babies Hospital, where they were admitted for treatment relating to malnutrition. Upon their release from Rainbow Babies Hospital, on July 16, 2018, the Agency filed a motions for temporary custody in both cases. The motions were granted by the juvenile court at an ex parte hearing.

{¶ 4} On August 3, 2018, the Agency filed a motion in each case requesting that the parents' visitation with the children be suspended due to the parents having left behind bed bugs in the Agency lobby during their last visit. The juvenile court granted the motion on August 3, 2018, and the parents were told that they could resume visitation after providing documentation that they had remedied the bed bug problem.

{¶ 5} On September 10, 2019, the Agency filed motions for permanent custody, alleging that a transfer of permanent custody was in the best interest of the children because the children had been in the custody of the Agency for more than 12 months, they could not be placed with either parent within a reasonable time or should not be placed with their parents, the parents had demonstrated a lack of commitment to the children and had abandoned them, and the parents had not completed or complied with the case plan requirements.

{¶ 6} On September 27, 2019, the Agency filed a motion for a court order reinstating the parents' visitation with the children, after the caseworker had obtained

3.

paperwork from the homeless shelter where the parents were staying confirming that the shelter was free of bed bugs. The juvenile court granted the motion on September 30, 2019, and the parents resumed visitation with the children on October 17, 2019, some 14 ½ months after the suspension began.

{¶ 7} An evidentiary hearing on the Agency's motions for permanent custody was held on October 6, 2020, by which time the children had been in the custody of the Agency for nearly 27 months. On December 7, 2020, the magistrate issued a decision recommending that the Agency's motions for permanent custody be granted. On October 25, 2021, the juvenile court entered judgment entries approving and adopting the proposed decision of the magistrate. The juvenile court concluded that: (1) the children could not be placed with either parent within a reasonable time or should not be placed with either parent, as provided for in R.C. 2151.414(B)(1)(a); (2) the children had been abandoned, as provided for in R.C. 2151.414(B)(1)(b); (3) the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period, as provided for in R.C. 2151.414(B(1)(d); and (4) permanent custody of the children in the Agency was in the children's best interest. Mother timely appealed the juvenile court's decisions.

### Statement of the Facts

{¶ 8} Emeline Clyburn, the Agency's Investigation Supervisor, testified that the Agency first became involved with the family in February 2018, at which time only the

4.

daughter had been born. The Agency had received reports that the daughter was not meeting developmental milestones, had significant delays, had missed medical appointments, and was suffering from a very bad case of cradle cap.

{¶ 9} Clyburn went to the family's residence with the Health Department to investigate and found that "the house was cluttered," "[t]here was dirty laundry" and "food debris on the floor," there were "cat litter boxes that needed to be cleaned," and there were cockroaches present. Clyburn also noticed that the daughter, who was approximately 1 1/2 years old at the time, was "small," "she had very poor trunk strength," and she "was not able to hold herself up." Clyburn testified that this was unusual, in her experience, as children that age are typically able to sit on their own and hold themselves upright, walk or crawl, and pull themselves up to stand. Clyburn also noticed that the daughter was "disheveled" and that she had on "a sleeper that was * * * soiled." Furthermore, the daughter had cradle cap covering "most of the top of her head" and going "down the back of her neck and the sides of her face." Clyburn explained that cradle cap is a skin condition that causes scaling and flaking on the head, and that it is typical for infants to have "small patches on the top of the head." She further stated that, in her training and experience, "[i]t is unusual to have [cradle cap scales] covering that much of the body."

{¶ 10} When the Agency later obtained the child's medical records, it also learned that the daughter had missed several non-routine medical appointments, including a

5.

neurologist visit, to address developmental delays, and a dermatology appointment, to address her cradle cap. During a home visit, a team from "Help Me Grow" parent support services advised Clyburn that the daughter "had a multitude of concerns that needed to be addressed." Clyburn testified that Mother did not appear to understand the scope of her daughter's developmental needs.

{¶ 11} Clyburn further testified that around the time that daughter was adjudicated to be dependent, Mother gave birth to her second child, a son, and the Agency filed for protective supervision over him as well. When Clyburn conducted a follow-up visit to the home, she became concerned when she saw that the son was dressed in nothing but a onesie garment. Clyburn further stated that in June of 2018, on the day when the case was passed to the ongoing caseworker, the agency also received concerns about the boy's size and about the fact that he was not feeding well or gaining weight.

{¶ 12} Clyburn testified that the condition of the parents' home improved somewhat during her home visits, but that there were continuing concerns about the smell of sour milk that was in the household, dirty laundry that was strewn about the home, and a dirty diaper that was discovered on the couch. Clyburn also suspected that there was some sort of a drug problem, after she smelled marijuana in the home during at least two home visits. Clyburn further observed during home visits that both parents "appeared to be disheveled" and "in need of a bath." There were also mental health concerns with respect to the parents. That said, Clyburn confirmed that Mother was cooperative in

6.

signing releases for medical records, and that it was not initially recommended that the children be removed from the home.

{¶ 13} Jody Moen, an ongoing caseworker who worked on the case for approximately two months, beginning in June 2018, testified that she went to the parents' home on June 12, 2018 and "observed both children to have large heads and small bodies." Moen testified that she visited the family multiple times over the next month, and that she felt "something was not right," as evidenced by the fact that the son was not gaining weight and because the daughter was very thin, developmentally delayed, and had no muscle control over her neck or middle section. Moen took the children to their primary care physician for a weight check, but the doctor's office did not discern that anything was wrong.

{¶ 14} Moen continued to talk to the parents about having Peds on Wheels come to the home so that a pediatrician could examine the children, but the parents refused to consent. Moen took her supervisor to the home on July 3, 2018, because she continued to suspect that something was wrong, but the supervisor did not agree with her. The following week, the Agency received a report from a person who was concerned that the children "looked unhealthy, looked very low weight," and "weren't developmentally on task." In order to investigate the new complaint, Moen met the doctor from Peds on Wheels at the family's home on July 13, 2018. The doctor, after examining the children, instructed Moen to take them directly to Firelands Hospital, because they were both

7.

underweight. At the hospital, staff examined the children and placed an IV in the son. Both children were admitted into Firelands Hospital and, soon after, were transported to Rainbow Babies Hospital, in Cleveland. The Agency decided to file for emergency temporary custody of the children, and subsequently took custody of them upon their discharge from Rainbow Babies Hospital, in July 2018.

{¶ 15} Moen testified that after the Agency took custody of the children, the parents did not seem very interested in reunification. They never asked about the children when Moen met with them, although they did visit the children twice while Moen was the caseworker. On August 3, 2018, the Agency obtained a court order suspending the parents' visitation, because it was discovered that during their last visit they had left behind bed bugs in the lobby area of the Agency. Moen advised the parents that they could reestablish visitation by having a company come to their home and confirm that they no longer had bed bugs. By the middle of August, however, when Moen passed the case on to another caseworker, the parents had yet to act on this advice. Moen testified that the parents never contacted her during this, or any other time, to ask about the children.

{¶ 16} Moen amended the case plan after the Agency received temporary custody of the children to include anger management instruction for Father, parenting instruction for both Mother and Father, Help Me Grow releases, mental health assessments for both parents, the requirement of a clean safe home, home visits, monthly face-to-face visits,

8.

and a psychological assessment with a parenting component. Moen testified that Mother was "doing her mental health" through Firelands, but that Father had not begun to address any of the requirements that were on his case plan. At the time Moen turned the case over in mid-August 2018, the Agency's concerns had not been remedied and she could not recommend returning the children to their parents' custody.

{¶ 17} Ashley Gilbert, the ongoing caseworker who has had the case since August 2018, testified that the case plan required both parents to complete a mental health assessment, a psychological assessment with a parenting component, agency-approved parenting classes, and certain activities in the home to address the bed bug and cockroach issues and to keep the home sanitary. The case plan also required father to complete anger management instruction. At the time Gilbert took over the case in August 2018, neither parent had completed any of the case plan requirements. After Father's drug screen tested positive for cocaine and both parents admitted to actively using cocaine, the case plan was amended in January 2019 to require that both parents also complete a drug and alcohol assessment, follow all treatment recommendations, and submit to random drug screens. During visits with parents, Gilbert also observed evidence of illicit drug use in the home, including drug paraphernalia, what appeared to be a crack pipe, marijuana, bongs, a white substance in a plastic bag, and prescription bottles lying on the floor. In October 2019, the case plan was further amended to add additional housing and personal hygiene requirements for the parents.

9.

{¶ 18} When Gilbert took over the case in August 2018, the parents' visitation with the children had already been suspended due to the bed bug issue. In order for them to resume their visitation, the parents were required to obtain documentation from a pest inspector or someone else who could confirm there were no bed bugs in their residence. A couple of weeks after Gilbert took over the case, the parents moved out of their home and into a motel. Gilbert gave the parents the telephone number of a Terminix pest control service, which she had confirmed would perform one free inspection per year, and she told them that because they lived in a commercial property, they would need to have the motel manager call to schedule an inspection. Gilbert continued to follow up with the parents and to advise them of what they needed to do to resume their visitation, but they never made any attempt to address the bed bug concern. As a result, the parents went 14 ½ months without visiting the children. Gilbert testified that during this time, the parents did not ask about their children. When the parents later moved into a homeless shelter, Mother told Gilbert that she had talked to a manager about getting documentation to confirm that the shelter did not have bed bugs. When Gilbert still did not receive any documentation from Mother, Gilbert herself reached out to the shelter and was able to obtain a letter confirming that they had no current bed bug problem. Gilbert then advised the parents to contact their respective attorneys to petition the court to reinstate their visitations. When, after several weeks, the parents had yet to file a petition, the Agency filed its own motion to reinstate visitation, on the parents' behalf.

10.

The visitations finally resumed on October 17, 2019. During one of these resumed visits, the parents brought gallon-size bags of Cheerios for each child. Gilbert stated that she was concerned about the amount of food the children were consuming during the visit and about the fact that the parents were not paying attention to what the children were doing, because both children had almost choked on food numerous times while trying to eat too fast.

{¶ 19} Gilbert testified that the Agency had to stop in-person visitations from the middle of March 2020 through June 2020 due to the COVID-19 pandemic. During that time, the parents did not have or request any video or telephone contact with the children. They resumed visitation in early June 2020, but Gilbert testified that there was "still limited bond attachment" observed between the parents and the children.

{¶ 20} Gilbert testified that Mother "had a job pretty consistently throughout the ongoing case," even though she switched employers several times and, over the relevant time period, held a total of approximately five jobs. Gilbert testified that Father struggled with employment, having held a total of eight or nine different jobs, each of which typically lasted only a matter of weeks. Gilbert confirmed that Father spent more time unemployed than employed and that, according to Mother, Father "was at home a lot with the children while [Mother] was out working."

{¶ 21} With respect to the parents' housing, Gilbert explained that they started on North Forrest Drive, moved into three different motels, later moved into a homeless

11.

shelter, and finally moved into their current residence, where, at the time of the hearing, they had lived for approximately one year. Gilbert described their current residence as dirty, cluttered with trash bags, with trash on the floor, crusted food all over the stove and counter areas, and dishes stacked up in the kitchen. Gilbert further testified that the home "usually has a foul odor" from dirty laundry or body odor. Gilbert also observed drug paraphernalia and knives left out in the parents' home. Furthermore, the parents did not have any furniture or proper sleeping arrangements for the children. Thus, Gilbert testified that she could not approve their housing.

{¶ 22} Gilbert confirmed that the parents had completed parenting classes in March of 2019, a psychological assessment with a parenting component, and that Mother had taken all drug screens when asked. Although Mother had previously been compliant with the mental health and drug and alcohol components of the case plan, she was no longer compliant at the time of the hearing, because she had stopped attending services in April 2020. Father was also not compliant with the mental health and drug and alcohol components of the case plan, having failed to engage in any services since January 2020.

{¶ 23} Gilbert testified that in her professional opinion, the parents had not demonstrated a commitment to reunification with their children, based on the 14 ½-month time period during which they failed to visit their children, their lack of engagement, and their failure to follow through with their own treatment. Gilbert further testified that the parents could not provide an adequate permanent home for the children,

12.

and that it was her opinion that the children could not be placed with either parent within a reasonable amount of time. The biggest barriers to placing the children with their parents, according to Gilbert, was the unaddressed substance abuse concerns and the lack of insight by the parents as to what they need to change going forward.

{¶ 24} Gilbert testified that she does not feel that there is an attachment between the children and their parents, and that the children simply associate the parental visits with "play time and food." By contrast, Gilbert testified that the children, who have been with their current foster family since September 2019, "are extremely bonded" to their foster parents and have "really grown and developed over the course of the last year." During that time, both children have engaged in speech therapy, occupational therapy, physical therapy, and behavioral counseling. The daughter also sees a neurologist at least twice a year, to ensure that certain spots she has on her brain are not getting worse, and she has undergone genetic testing for autism. The son is still engaged in Help Me Grow services. Gilbert testified that she does not believe that the biological parents understand the extent of the children's special needs or that they would be able to keep up with all of the necessary treatments if they were reunited with the children. Thus, she testified that it was her opinion that an award of permanent custody to the Agency was in the children's best interest.

{¶ 25} Bridget Lemberg, the Lab Director and Toxicologist at Forensic Fluids Laboratory, testified that three of the 16 samples collected from Mother tested positive

13.

for cocaine, as recently as March 29, 2019. She also testified that 12 of the 17 samples collected from Father had tested positive for drugs, including amphetamines, methamphetamines, and cocaine.

{¶ 26} Allison Roth, the children's foster mother, testified that the children had been placed with her and her husband since September 2019. When the children arrived at her home, the daughter had just started walking and was behind both developmentally and verbally; she could not speak any words and communicated only through screaming and yelling. The son was not walking or speaking, and his motor skills were delayed. Both children had eating issues; they swallowed their food whole and shoveled it in their mouths to the point where Roth had to perform the Heimlich maneuver on each of them approximately ten times over the course of one year.

{¶ 27} Roth testified that both children go to speech therapy twice a week and to occupational and physical therapy once a week. They also attend behavioral counseling, they see a nutritionist, and they regularly see the dentist and eye doctor. The son is engaged in Help Me Grow, while the daughter graduated from the program. Roth testified that both children have night terrors, though the daughter has them much more frequently than does the son. The night terrors began shortly after the children's first visitation with their parents in October 2019, subsided during the 2 1/2 months that visitation was paused due to the pandemic, and then started again on June 4, 2020, when visitations with the parents resumed. Roth also noticed that the children were making

14.

greater strides in the weeks during which visitation with the parents had been suspended due to the pandemic; not only did the daughter's night terrors almost disappear, but the children began speaking in full sentences and the daughter's eczema went away. Once the visitations resumed in June 2020, however, the children regressed.

{¶ 28} Roth testified that both children had made great strides in the last year. They now eat every two hours, maintain a consistent schedule, and are both potty-trained. However, the children are still not within the normal range on the growth chart and have various issues left to resolve. Roth feels that the children are bonded to her and to her husband, and she stated that she and her husband are willing to continue to provide a home for them.

{¶ 29} Patty James, the children's CASA representative, testified that the children are receiving very good and diligent care in their foster home, and that they have developed a strong bond with their foster parents. James testified that the daughter has had many developmental delays, but that she has made progress by going to the SPOT Program, as well as to speech, physical and occupational therapy. James has observed visits between the children and their biological parents, during which she has not noticed any excitement from the children or any bond with the parents. James has also visited the parents a couple of times at the motel in which they were living, which she described as cramped, cluttered, not clean, and dark. In addition, James attempted two visits with the parents at their current residence, but no one answered the door. James confirmed that

15.

Mother has had some successes, including completion of parenting classes and a psychological assessment. However, James testified that it was her opinion that the parents could not adequately meet the children's needs, because "it appears that they struggle with meeting some of their own needs." She, therefore, recommended that the juvenile court award permanent custody of the children to the Agency.

{¶ 30} James Melle, the children's guardian ad litem, also testified that the children were thriving in their foster home, and that their foster family is making sure that their special needs are met. He further testified that after observing a visit between parents and the children, he was concerned that there was not a strong bond with the children. Melle testified that he also has concerns about not being able to schedule a time with parents to view their current residence, and about the fact that Mother failed to send pictures of the home, as she had previously offered. Melle, therefore, testified that he believes it is in the children's best interest that they be placed in the permanent care of the Agency and that they stay with their foster parents.

**Assignment of Error**

{¶ 31} Mother asserts the following assignment of error on appeal:

I. The Trial Court's conclusion that there was clear and convincing evidence that the Agency met its burden under R.C. Sec. 2151.414, was against the manifest weight of the evidence.

**Analysis**

{¶ 32} In her sole assignment of error, Mother asserts that the juvenile court's conclusion that there was clear and convincing evidence that the Agency had met its burden pursuant to R.C. 2151.414 was against the manifest weight of the evidence. The Agency asserts that Mother's assignment of error is "incorrect and not well-founded," because there is clear and convincing evidence that one or more of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) applies and because granting permanent custody to the Agency is in the child's best interest.

{¶ 33} R.C. 2151.414 delineates "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 36 (6th Dist.), citing *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 18. As relevant here, the court must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. *See* R.C. 2151.414(B)(1); *see also In re T.J.* at ¶ 36 and *In re A.M.* at ¶ 18. All of the courts findings under R.C. 2151.414 must be supported by clear and convincing evidence. *In re T.J.* at ¶ 36. "Clear and convincing evidence" is evidence that allows the trier of fact "to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established." *Id.*

{¶ 34} In the instant case, the trial court found, with respect to the first requirement, that R.C. 2151.414(B)(1)(a), (b), and (d) applied, i.e., that the children cannot and should not be placed with either of the parents within a reasonable time, that the children were abandoned, and that the children have been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. On appeal, Mother contends that the juvenile court's findings that the children were abandoned and that they could not be placed with either of their parents within a reasonable time or they should not be placed with their parents were against the manifest weight of the evidence. Importantly, however, Mother does not dispute the juvenile court's finding, pursuant to R.C. 2151.414(B)(1)(d), that the children have been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. As the first prong of the permanent custody test is satisfied where "one or more" of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) applies, the juvenile court's undisputed finding under R.C. 2151.414(B)(1)(d) is sufficient to establish the first requirement of the statute. *See In re B.C.,* 12th Dist. Warren Nos. CA2018-03-024, CA2018-03-027, 2018-Ohio-2673, ¶ 16 ("To satisfy part two of the permanent custody test, only one of the [R.C. 2151.414(B)(1)(a) through (e)] findings need be met."); *In re D.P.*, 6th Dist. Erie No. E-11-023, 2011-Ohio-4138, ¶ 52 ("Once a finding is made by the court satisfying one of the factors enumerated in R.C. 2151.414(B)(1), the trial court must only determine if an award of permanent custody to the agency is in the child's best interest.").

18.

{¶ 35} Next, we consider the second prong of the permanent custody test, involving the question of whether a grant of permanent custody is in the child's best interest. It is the Agency's burden to prove by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *See In re A.M.*, ¶ 19. In making a best interest determination, a court is guided by R.C. 2151.414(D)(1), which provides:

> In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 36} A trial court's determination in a permanent custody case is reviewed under a manifest-weight-of-the-evidence standard. *In re P.W.,* 6th Dist. Lucas No. L-12-1060,

2012-Ohio-3556, ¶ 20. Pursuant to this standard, "we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed." *In re T.J.,* 2021-Ohio-4085, 180 N.E.3d 706 at ¶ 40, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In performing this analysis, "we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony." *In re T.J.* at ¶ 40. The juvenile court's discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotation marks and citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

{¶ 37} In the instant case, the juvenile court found that granting the Agency permanent custody was in the children's best interest. Mother contends in her appeal that the court "misapplied or misstated several facts" in its consideration of the relevant best interest factors.

{¶ 38} Regarding the best interest factor set forth in R.C. 2151.414(D)(1)(a), which deals with the children's relationships with others, the magistrate found that:

20.

The caseworker repeatedly asked both [Father] and [Mother] for the names of relatives who could be a potential option for permanency for the children. The only name was [Mother's] mother and [Mother's] mother did not complete the paperwork provided by the Agency. There have been no relationships or interaction with the children by paternal or maternal relatives. When visitation between the children and parents resumed on October 17, 2019, at that first visit the caseworker brought the children into the visitation room where the parents were seated; the parents didn't get up to greet their children, nor show any love or affection; and the children didn't move towards their parents. The caseworker opined she doesn't feel there is a bond between the children and parents. Both the CASA and GAL concurred that they don't believe the children have a strong bond with their parents. Conversely, it was clear from the testimony of the GAL and the foster-mom that both children are strongly bonded to their foster parents, who they have lived with full-time since September 27, 2019.

{¶ 39} The juvenile court further supplemented the findings regarding the children's relationships, as follows:

[N]one of the parties ([J.M.], Mother and [Father]), have demonstrated much of a commitment to, nor have they established a strong bond with the child[ren]. There are no relatives who have shown interest in or have had

21.

contact with the child[ren]. The child[ren] [are] strongly bonded with [their] sibling and foster parents.

{¶ 40} Mother has not challenged any of the court's findings as to this factor. Indeed, caseworkers Moen and Gilbert each testified that after the Agency took custody of the children, the parents did not seem interested in reunification and never asked about the children during any of their home visits. Both caseworkers also testified that the parents never contacted them to ask how the children were doing, including during the 14 ½ months that their visitation was suspended. Furthermore, the parents did not have or request any video or telephone contact with the children when the Agency was forced to halt in-person visitations from mid-March through June 2020 due to the pandemic.

{¶ 41} Caseworker Gilbert further testified that she does not believe that there is an attachment between the children and their parents. The CASA representative and the guardian ad litem echoed this opinion at the hearing. Conversely, they all testified that the children have a strong bond with their foster parents, who they have lived with since September 2019. The foster mother testified that the children are bonded to both her and her husband, and that they are willing to continue to provide a home for them.

{¶ 42} We find that the weight of the evidence supports the juvenile court's findings and that the court properly considered R.C. 2151.414(D)(1)(a).

{¶ 43} Regarding the best interest factor set forth in R.C. 2151.414(D)(1)(b), which deals with the children's wishes, the magistrate found that neither child is old

22.

enough to be able to express their wishes regarding permanency, and that "[b]oth the GAL and CASA believe that it would be in the children's best interest to grant permanent custody to [the Agency] to facilitate adoption (note, the foster-mom testified that she and her husband are willing to provide the children a home as long as they need one.)." Mother has not challenged any of the court's findings as to this factor. Indeed, the guardian ad litem and the CASA representative both testified that they believed that granting permanent custody to the Agency was in the children's best interest.

{¶ 44} We find that the children's wishes, as expressed by the CASA representative and the guardian ad litem, favored the Agency under R.C. 2151.414(D)(1)(b) and that the juvenile court's decisions were not against the manifest weight of the evidence.

{¶ 45} With respect to the best interest factor set forth in R.C. 2151.414(D)(1)(c), regarding custodial history, the magistrate found that the children were placed in the custody of the Agency on July 16, 2018 "and have remained in the custody of the Agency since, a period of over two years." The juvenile court further found that the children had been removed from their home at two years and two months of age, respectively, and that they had "lived away from [their] parents most of [their] life." Mother has not disputed these findings.

{¶ 46} Furthermore, Mother's efforts to maintain visitation and seek reunification have been limited. The parents' visitation with the children was suspended for 14 ½

23.

months, between August 2018 and October 2019, due to a bed bug infestation. Caseworkers Moen and Gilbert each testified that although they had advised the parents as to how to reestablish visitation, the parents failed to take the necessary actions. The parents' in-person visitation with the children was also halted from mid-March through June 2020, due to the pandemic, during which time the parents did not have or request any video or telephone contact with the children. Finally, the record establishes that neither parent had substantially complied with the case plan requirements, which further delayed reunification.

{¶ 47} These facts support the juvenile court's finding that R.C. 2151.414(D)(1)(c) weighed in favor of granting permanent custody to the Agency.

{¶ 48} With respect to R.C. 2151.414(D)(1)(d), regarding the children's need for a legally secure placement, the magistrate found:

> The children most definitely need a legally secure permanent placement, as attested to by the caseworker, foster-mom, CASA and the GAL. The children's mother and father cannot provide a permanent home for them, as they have a history of unstable housing and employment and haven't demonstrated they comprehend the children's special needs, let alone have the ability to meet those needs. Neither parent successfully completed mental health services or drug and alcohol services as directed by the case plan. Both parents have pending felony child endangering charges against

24.

them, concerning these children.  The CASA summed it up best when she testified that the parents cannot meet the children's needs, as they struggle to meet their own needs.

**{¶ 49}** The juvenile court found:

Child[ren] need[] a legally secure placement and [the Agency] is the only one able to provide that now or in the foreseeable future.  Specifically, the evidence established that Mother and [Father] show lack of organization, initiative and insight sufficient to meet their children's special as well as basic needs.  They have had over two years to get the help they needed and have not done so.  They presented no evidence challenging this.

**{¶ 50}** "Although the Ohio Revised code does not define the term, 'legally secure permanent placement,' courts have generally interpreted the phrase to mean 'a safe, stable, consistent environment where a child's needs will be met." *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706 at ¶ 59.

**{¶ 51}** Mother contends that the juvenile court incorrectly concluded that her employment and housing instability was a negative factor.  As indicated above, caseworker Gilbert, who has been assigned to the case since August 2018, testified that Mother "has had a job pretty consistently throughout the ongoing case," having held approximately five jobs.  However, Gilbert further testified that Father has struggled with employment, and has spent more time unemployed than employed.  Mother still lives

25.

with Father and has previously indicated that he is the person who supervises the children while she works. Father has not complied with the case plan requirements, including the mental health and drug and alcohol components. Furthermore, Father has refused drug screens and, on 12 occasions, has tested positive for drugs, including amphetamines, methamphetamines, and cocaine.

{¶ 52} With respect to the parents' housing, the caseworker testified that the parents started on North Forrest Drive, moved into three different motels, later moved into a homeless shelter, and finally moved into their current residence at the time of the hearing. The parents had been in their current residence for approximately one year at the time of the hearing. However, testimony by caseworker Gilbert established that the parents' current residence is dirty and cluttered with trash bags, there are dishes stacked up in the kitchen area, and there is food crusted all over the stove and countertops. Gilbert further testified that the home "usually has a foul odor" from dirty laundry or body odor. She also observed drug paraphernalia and knives left out in the parents' home. In addition, the parents did not have any furniture or proper sleeping arrangements for the children in the residence. Gilbert, therefore, could not approve the parents' housing. Patty James, the children's CASA representative, testified that she had attempted two visits to the parents' current residence, but no one had answered the door. James Melle, the children's guardian ad litem, testified that he also had concerns about not being able to schedule a time with the parents to view their current residence, and that

26.

Mother had failed to send him pictures of the home after offering to do so. Thus, the juvenile court's finding that parents have "a history of unstable housing and employment," is supported by the record and, further, supports the granting of permanent custody to the Agency.

{¶ 53} Mother also disputes the juvenile court's finding that she neglected to attend to the children's medical and development needs. Specifically, the juvenile court found that:

Mother and [Father] neglected to attend to the medical, physical and developmental needs of the children resulting in them being hospitalized on an emergency basis for malnourishment and failure to thrive. * * * Mother and [Father], both, show little initiative to learn about and to apply what is necessary to meet [daughter's] special needs, let alone both children's basic needs.

{¶ 54} The magistrate similarly found that:

The initial concerns, why the Agency filed complaints asking for protective supervision, was neglect. [Daughter] had severe cradle cap and the parents were missing doctors' appointments for her. Several months later when the Agency filed an emergency Motion for Custody it was due to a doctor's concern with the children's failure to thrive. [Father and Mother] never seemed to internalize what their children would need to live a safe, healthy

27.

life. They also showed little insight regarding understanding why their children were removed from them in the first place, despite the fact that when the children were taken to the local Emergency Room, they were then sent to Rainbow Babies Hospital.

{¶ 55} Contrary to Mother's claim, there is abundant clear and convincing evidence in the record to support the juvenile court's finding that the parents failed to attend to the medical, physical and developmental needs of the children. The Agency's Investigation Supervisor Clyburn testified that the Agency first became involved with the family in February 2018, after receiving reports that the daughter was not meeting developmental milestones, had some significant delays, had missed medical appointments, and had "a very bad case of cradle cap." Clyburn testified that when she went to the home to investigate, she noticed that the daughter, who was approximately 1 ½ years old at the time, was "small," "she had very poor trunk strength," and she "was notable to hold herself up." She testified that this was unusual, in her experience, as children that age are typically able to sit on their own and hold themselves upright, walk or crawl, and pull themselves up to stand. Clyburn also noticed that daughter had cradle cap covering "most of the top of her head and down the back of her neck and the sides of her fact." Clyburn testified that it was highly unusual to have cradle cap covering that much of a child's body. Furthermore, when the Agency obtained the daughter's medical records, it learned that she had missed several non-routine medical appointments,

28.

including a neurologist visit, to address developmental delays, and a dermatology appointment, to address the cradle cap. When Clyburn did a home visit with the team from Help Me Grow, they advised that the child had a multitude of concerns that needed to be addressed. According to Clyburn, Mother did not appear to understand the scope of her daughter's developmental needs.

{¶ 56} Caseworker Moen also testified that she "observed both children to have large heads and small bodies. Moen testified that she felt "something was not right" – the son was not gaining weight and the daughter was very thin, developmentally delayed, and had no muscle control over her neck or middle section. Moen took the children to their primary care physician for a weight check, but the doctor's office did not discern that anything was wrong. Moen continued to talk to the parents about having Peds on Wheels come into the home so that a pediatrician could examine the children, but the parents refused to consent. Moen also took her supervisor to the home on July 3, 2018, because she still felt that something was wrong, but her supervisor did not agree with her. The following week, the Agency received a report from a person who was concerned that the children "looked unhealthy, looked very low weight," and "weren't developmentally on task." Moen then met Peds on Wheels at the family's home on July 3, 2018, and the doctor asked her to take the children to Firelands Hospital immediately, because both children were underweight. At the hospital, staff examine the children and placed an IV

in the son. Both children were admitted into the hospital and were subsequently transported to Rainbow Babies Hospital, in Cleveland.

{¶ 57} The juvenile court's finding that that the parents showed little initiative to learn about and apply what is necessary to meet the children's special needs is also supported by the record. The children's foster mother testified that both children go to speech therapy twice a week and to occupational and physical therapy once a week. In addition, they attend behavioral counseling, they see a nutritionist, and they regularly see the dentist and eye doctor. The daughter also sees a neurologist at least twice a year to address spots on her brain, and has undergone genetic testing for autism. She son is still engaged in Help Me Grow services.

{¶ 58} Caseworker Gilbert, who has had the case since August 2018, testified that she does not believe that the parents understand the extent of the children's special needs or that they would be able to keep up with all of the children's treatments, if they were reunified with the children. The CASA representative also testified that she does not believe that the parents can adequately meet the children's needs, because "it appears that they struggle with meeting some of their own needs." Thus, there was ample evidence in the record to support the juvenile court's findings that the parents neglected to attend to the medical, physical, and developmental needs of the children, and that they have failed to learn about and apply what is necessary to meet the children's ongoing special needs.

30.

{¶ 59} Mother additionally disputes the juvenile court's finding that the parents appear to have many unmet behavioral issues as demonstrated by their drug use, lack of safe and sanitary housekeeping, and their lack of healthy personal hygiene. Mother, however, tested positive for cocaine on three occasions, most recently on March 29, 2019. Father also tested positive for drugs -- including amphetamines, methamphetamines, and cocaine -- on 12 occasions. As previously noted, Mother still resides with Father and has indicated that he supervises the children while she works. Further, caseworker Gilbert testified that she observed evidence of illicit drug use in the parents' home, including drug paraphernalia, what appeared to be a crack pipe, marijuana, bongs, a white substance in a plastic bag, and prescription drug bottles lying on the floor. Gilbert also testified that the parents' current residence is dirty and cluttered with trash, and that the home "usually has a foul odor" from either dirty laundry or body odor. Thus, there is clear and convincing evidence in the record supporting the juvenile court's finding that the parents have unmet behavioral issues.

{¶ 60} Finally, Mother disputes the juvenile court's finding that she did not successfully complete mental health services or drug and alcohol services, as directed by the case plan. Caseworker Gilbert testified that although Mother had previously been compliant with the mental health and drug and alcohol components of the case plan, she was no longer compliant at the time of the hearing, because she had stopped attending services in April 2020, though she claimed to have resumed services the week before the

31.

hearing. Father, who resides with Mother, was also not compliant with the mental health and drug and alcohol components of the case plan, not having engaged in services since January 2020. As the juvenile court noted, the parents "have had over two years to get the help they needed and have not done so."

{¶ 61} That Mother and Father may have complied with some aspects of the case plan does nothing to alter the outcome of this analysis in this case. As this court has recently recognized, case plan compliance, while relevant to a best-interest determination, is not dispositive of it. *See In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706 at ¶ 72. Even "substantial compliance" "is but one of many factors the court may find relevant * * * in rendering its judgment." *Id.* at ¶ 76. Here, the juvenile court found that the best interest factors supporting an award of permanent custody to the Agency outweighed Mother's completion of parts of her case plan. We find that the evidence supports that decision.

{¶ 62} With respect to R.C. 2151.414(D)(1)(e), regarding whether any of the factors in R.C. 2151.414(E)(7) through (11) apply to the parents and children, the magistrate found that divisions (E)(7)(c) and (E)(10) were relevant or, at least, potentially relevant. R.C. 2151.414(E)(7)(c) and (E)(10) set forth the following factors:

(7) The parent has been convicted of or pleaded guilty to one of the following:

32.

(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

\* \* \*

(10) The parent has abandoned the child.

{¶ 63} In relationship to the current case, the magistrate stated the following:

The Magistrate finds that concerning (E)(7)(c) both parents have been indicted for two counts of child endangering, felonies of the third degree. However, at the time of hearing the charges are pending and they have not been convicted nor plead guilty. The Magistrate also finds that (E)(10) applies to [J.M., Mother and Father].

{¶ 64} Regarding section (E)(7)(c), testimony at the hearing established that Mother and Father had pending charges of child endangering that had not been resolved. The magistrate's decision accurately reflects the fact that, although there were pending charges at the time of the hearing, there were no convictions against either Mother or Father. Thus, it appears from the magistrate's decision that section (E)(7)(c) was properly rejected as a factor in the custody determination.

33.

**{¶ 65}** Regarding section (E)(10), there is abundant evidence that the parents abandoned the children. "For purposes of [Chapter 2151], a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). Here, the parents went 14 1/2 consecutive months without visiting the children after their visitation was suspended on August 3, 2018, due to bed bugs. During this time period, the parents never asked about the children or attempted to speak to them over the phone or video.

**{¶ 66}** Mother's suggestion that the finding of abandonment was inappropriate because the decision not to remedy the bed bug problem was not the product of her "active choices" is wholly without merit. As indicated above, Mother's visitation was suspended due to bed bugs that the parents had left behind in the lobby area during their last visit. Both caseworkers testified that they advised Mother numerous times that that the parents could reestablish visitation by having a company come into their home and confirm that they no longer had bed bugs. Caseworker Gilbert provided the parents with the telephone number of a company that she had confirmed would perform one free inspection per year, and she advised Mother to have the motel manager where the parents were staying call to schedule an appointment. Despite these referrals and advisements, the parents voluntarily chose not to resolve the bed bug issue. Mother later advised Gilbert that she had talked to a manager at the homeless shelter where she was staying

34.

about getting the necessary documentation, but she again failed to follow through. Finally, Gilbert herself reached out to the shelter and was able to obtain the necessary documentation. When, several weeks later, the parents had still failed to file a petition to resume visitation, it was the Agency that filed a motion on the parents' behalf to resume their visitations. We, therefore, find that the record contains clear and convincing evidence supporting the magistrate's finding that the parents "voluntarily chose not to remedy their bed bug problem and it was their choices that led to their inability to see their children."

{¶ 67} For all of the foregoing reasons, we find that the juvenile court's decisions were supported by clear and convincing evidence and were not against the manifest weight of the evidence. We find that Mother's assignment of error is without merit. Therefore, the judgment of the Erie County Common Pleas Court, Juvenile Division is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                           _____
                                                      JUDGE

Christine E. Mayle, J.


Gene A. Zmuda, J.                               _____
CONCUR.                                                      JUDGE


                                                    _____
                                                      JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.