[Cite as *In re T.C.R.*, 2024-Ohio-4874.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re T.C.R.

Court of Appeals No.  H-24-017

Trial Court No.  DNA 2021 00071

**DECISION AND JUDGMENT**

Decided:  October 8, 2024

* * * * *

Richard H. Palau, for appellee.

Anthony J. Richardson, II, for appellant.

* * * * *.

**SULEK, P.J.**

{¶ 1} Appellant, M.R., appeals the judgment of the Huron County Court of Common Pleas, Juvenile Division, terminating his parental rights and awarding custody of his minor child, T.C.R., to appellee Huron County Department of Job and Family Services ("HCDJFS").  For the reasons that follow, the juvenile court's judgment is affirmed.

## I. Facts and Procedural Background

{¶ 2} H.R. is the mother of T.C.R., born November 2013, M.R., born March 2015, and P.A., born March 2021.[1] Appellant, M.R., is T.C.R.'s father. The present matter commenced on August 25, 2021, when HCDJFS filed a complaint in dependency alleging concerns regarding mother's live-in boyfriend. HCDJFS maintained that on July 28, 2021, mother's boyfriend used excessive force while disciplining T.C.R. HCDJFS learned of prior and subsequent altercations between mother and boyfriend. The agency alleged that mother failed to provide for her children's needs and while they were with a temporary caregiver, failed to provide sufficient financial assistance. As to T.C.R., HCDJFS alleged that mother was unwilling to engage him in mental health services following "trauma addressed in a previous Children Services case." The complaint listed T.C.R.'s father's name with a Fremont, Ohio, address.

{¶ 3} Following the shelter care hearing, the children remained in mother's custody "under the intensive protective supervision" of HCDJFS. Mother's boyfriend was ordered to vacate the residence and have no contact with the children. The court ordered that T.C.R.'s custodian ensure he submit to a mental health assessment and participate and successfully complete any recommended treatment or counseling.

{¶ 4} Father's summons to appear at the October 7, 2021 adjudicatory hearing, was sent to the address listed on the complaint. Service of the summons was

---

[1]Separate case numbers were assigned to each child.

2.

unsuccessful. On September 14, 2021, HCDJFS moved that father be served by publication. In support, the motion stated that "[a]fter diligent and reasonable efforts to locate [father], the Department is unable to find an accurate address or Post Office box for [father] and is unaware of his current whereabouts." The attached caseworker's affidavit stated that his attempts to locate father included inquiring of "relatives, friends, acquaintances, and parties as to the father's whereabouts on an ongoing basis." The court granted the motion and HCDJFS filed proof of publication on September 20, 2021.

{¶ 5} The family's initial case plan's stated goal was preventing the children's removal from mother's care. Mother was to obtain various assessments, report any abuse to proper authorities, attend parenting classes, secure employment, and maintain clean and safe housing. As to T.C.R., he was required to obtain a mental health assessment and follow through with recommendations and attend all counseling and medical appointments. On October 7, 2021, by mother's admission, the children were adjudicated dependent.

{¶ 6} The Guardian Ad Litem (GAL) filed a report on March 1, 2022, expressing her belief that the children should remain in mother's home. The GAL noted ongoing concerns regarding the condition of mother's home but acknowledged some improvement. Following the March 2, 2022 non-oral hearing, the court continued intensive, protective supervision.

{¶ 7} On April 6, 2022, the GAL issued a second report, which stated that mother had not addressed T.C.R.'s medical issues and was inconsistent in getting him to

3.

counseling appointments. She stated that the home had a bed bug infestation and that there was trash and debris inside and outside the home. Eviction proceedings were pending due to mother's failure to pay rent. The GAL stated that T.C.R.'s father has not been involved in his life and has not been part of the proceedings. She stated that T.C.R. and his brother, M.R., visit M.R.'s father whom they both consider to be their father, and the visits occur at paternal grandmother's home.

{¶ 8} The GAL believed that it was in the children's best interest for HCDJFS to seek alternative placement. She recommended that P.A.'s father be awarded temporary custody and that T.C.R. and M.R. be placed in the custody of their paternal aunt.[2]

{¶ 9} At the April 7, 2022 dispositional hearing, the juvenile court ordered that the children be placed in their aunt's temporary custody under intensive, protective supervision. Mother was granted supervised visitation. In May 2022, due to concerns at the aunt's home, the court ordered that the children be removed from her home and placed in HCDJFS' temporary custody. T.C.R. and M.R. were placed together in a foster home; P.A. was placed with his father. Due to severe behavioral issues, in September 2022, HCDJFS removed T.C.R. from the foster home and placed him in a residential treatment program.

{¶ 10} On August 15, 2023, HCDJFS moved for permanent custody of T.C.R. and M.R. The motion stated that the children had been in agency custody for 12 months of a

---

[2] Paternal aunt is not biologically related to T.C.R.

4.

22-month period and that they could not or should not be returned to their mother due to health and safety concerns at mother's home, including an on-going bed bug infestation. Another concern related to mother's current boyfriend and his teenage son who resided in the home. HCDJFS stated that the son has displayed problematic, violent behaviors during visits. He was involved in sexually acting-out behaviors at school.

{¶ 11} The motion stated T.C.R. was being treated at a residential facility for Post-Traumatic Stress Disorder, ADHD, Oppositional Defiant Disorder, and enuresis (bed wetting). Mother's phone calls and visits significantly increased T.C.R.'s anxiety. Mother inconsistently communicated with the facility.

{¶ 12} The motion stated that father was a "substantiated perpetrator of sexual abuse" in 1992, with an eight-year-old male victim. Further, "[T.C.R.] has not had any contact with his father for the duration of the case. [Father] has not contacted the agency with any additional relative placement options."

{¶ 13} The court notified father of the November 7, 2023 permanent custody hearing by publication. It continued the hearing multiple times. Father's first appearance in the case was at the February 8, 2024 pretrial. At the pretrial, the court ordered the GAL to submit an updated report by March 13, 2024. Father was granted supervised visitation with T.C.R. as arranged between he and HCDJFS.

{¶ 14} At the April 3, 2024 permanent custody hearing, father and his counsel were present. The parties initially discussed the GAL's failure to file a report prior to the hearing as required under Sup.R. 48. HCDJFS waived the requirement. Mother's

5.

attorney expressed his displeasure but did not wish to continue the hearing. Conversely, M.R.'s father's counsel objected stating that he had not seen a GAL report for some time and was unaware as to what the GAL's testimony would reveal. The children's attorney expressed that he had spoken with the GAL and was prepared to go forward. Finally, father's attorney stated: "I would just echo my colleagues' sentiments. I don't have any more to add to that though."[3]

{¶ 15} The court then proceeded with the hearing stating:

> Well, I certainly know what the rule says and what's contemplated in situations like this. I know [the GAL] has been here at every hearing since this case began in August of 2021 and the matter has been set a couple of times and been continued. And [the GAL] has been accessible and available for inquiry from all parties, and she's available today for cross-examination and direct examination.
> I also note . . . it's a fluid situation, that even underscores the, you know, I think if there had been a report, if it was a fluid situation, there would have needed to be an amendment to the report to reflect emerging information about the children.
> And she is here today. She's available for cross-examination and direct examination, so I don't know if there is an objection or a request that her testimony be blocked or limited. I don't know if that's what's being, you know, implied or inferred. I'm certainly going to be enabling her to testify today, but it is apparent from the record that there is not a report filed, so that is preserved for appellate purposes.

{¶ 16} HCDJFS caseworker, Tara D., worked with the family from July 2022 through March 2023. The caseworker stated that father had not been involved in this case until January 2024, when he reached out to the agency. Father explained that he did

---

[3]Although the transcript attributes the statement to E.R.'s attorney, it was made directly after the court addressed father's attorney. This court reviewed the recording of the proceedings included in the record finds that father's attorney made the statement.

6.

not get involved earlier because he was a carnival employee and had been touring for the duration of the case and unable to take T.C.R. Father expressed the desire for visitation but T.C.R.'s counselor advised against it because father was unknown to him. When asked about having contact with his father, T.C.R. appeared nervous, fidgety, and shook his head no.

{¶ 17} The caseworker testified that both children were placed with foster mother, K.H., in May 2022. T.C.R. resided there until September 2022, when he was placed in a residential treatment facility due to destructive behaviors, including enuresis and fecal smearing. He remained there until March 23, 2024, when he was placed in a new foster home where brother, M.R., had been since January 2024.

{¶ 18} The caseworker testified that T.C.R. still struggles with a lot of the same issues but that there has been a reduction in enuresis and fecal smearing. He has difficulty expressing his feelings, pretending to always be upbeat and happy. His new foster parents were working on getting him enrolled in counselling and extracurricular activities with his brother and planned to offer him a lot of one-on-one attention.

{¶ 19} The caseworker stated that the current foster parents were interested in adopting both children but acknowledged that T.C.R. has been in the home for only nine days. The children expressed that they would like to stay together.

{¶ 20} During father's attorney's cross-examination of the caseworker, she admitted that paternity had been established at birth and that father had been ordered to

7.

pay child support.[4]  The caseworker stated that father's involvement in the case began two or three months prior to the hearing.  The caseworker stated that the agency did not have his phone number; she admitted that other than asking mother, she made little effort to obtain it.

{¶ 21} The caseworker stated that she visited father's one-bedroom home where he had lived for approximately four months.  She stated that there was no discussion regarding whether any of father's relatives would be a good placement for T.C.R.

{¶ 22} Joanna C. testified that she worked with the family from April until December 2023, when she went on leave.  The caseworker stated that she had made several attempts to gain father's contact information and that during her leave, he contacted the agency.  The caseworker spoke with father the day before the hearing; he questioned why visitation had not happened.  She informed him that there were currently therapeutic concerns due to T.C.R. experiencing major life changes.

{¶ 23} The caseworker was cross-examined regarding her attempts to locate father.  She agreed that she did not utilize social media, including direct messaging, because agency policy discouraged it due to confidentiality concerns.  She made no attempts to see if father was the subject of a child support case.

{¶ 24} The GAL testified that she was assigned to the case at its inception in 2021.  She stated that M.R. and T.C.R. have never wavered in their desire to be together.  The

---

[4]The record contains no evidence that father was paying or had ever paid child support.

8.

GAL's chief concern was mother's ability to safely care for them and provide for their needs. She stated that the trauma experienced by the children had never been fully addressed. She recommended that M.R. and T.C.R. be placed in HCDJFS' permanent custody.

{¶ 25} The GAL acknowledged the newness of the children's current placement. M.R. had been there roughly three months and T.C.R. only nine days, and that both could be considered in the "honeymoon phase" of the placement. She agreed that the placement may not work out and that due to their ages, 8 and 10, finding adoptive placement could be challenging. Father's attorney did not cross-examine the GAL.

{¶ 26} On Friday, April 5, 2024, the juvenile court conducted the children's in-camera interviews. Thereafter, the court issued a decision and judgment entry granting HCDJFS permanent custody of M.R. and T.C.R. The court found that M.R. and T.C.R. had been in agency custody 12 or more months of the preceding consecutive 22 months, R.C. 2151.414(B)(1)(d), and that the children cannot or should not be placed with either parent within a reasonable time, R.C. 2951.414(B)(1)(a). As to father, the court noted "[T.C.R.]'s father, has been transient, although he has resided in one location in Findlay, Ohio for the past 4 months in a one-bedroom apartment. He has no relationship with [T.C.R.] currently."

{¶ 27} The court concluded that upon review of the factors in R.C. 2151.414(D), placing the children in HCDJFS' custody was in their best interest. Specifically, the court stated that it considered the children's wishes during their in-camera interviews and

9.

the GAL's opinion.  The court noted the children's strong desire to continue living together in their current foster home and the foster parents' willingness to adopt them.

{¶ 28} This appeal followed.

## II. Assignments of Error

{¶ 29} Father raises two assignments of error:

> (1.) The trial court committed reversible error by terminating appellant's parental rights.
> (2.) The trial court committed reversible error by failing to comply with R.C. 2151.281 and Sup.R. [4]8.06.

## III. Analysis

{¶ 30} The assignments of error will be addressed in reverse order.  Father's second assignment of error asserts that the juvenile court committed reversible error by proceeding with the hearing despite the GAL's failure to file a written report in compliance with R.C. 2151.281(A) and Sup.R. 48.06(B)(1).

{¶ 31} R.C. 2151.414(C) requires that a GAL file a written report prior to or at the time of the permanent custody hearing.  Sup.R. 48.06(B)(1) further provides:

> A guardian ad litem in abuse, neglect, dependency, unruly, and delinquency cases and actions to terminate parental rights shall provide a written report to the court, unrepresented parties, and legal counsel not less than seven days prior to any initial dispositional hearing, permanent custody hearing, and any hearing upon a motion requesting a change in disposition.  The court may alter the seven-day period as may be necessary for the administration of justice.

"The obvious purpose of requiring the filing of the report at least seven days before the hearing is to provide the parties with a reasonable opportunity to review the report before

10.

the hearing." *In re L.A.*, 2023-Ohio-1877, ¶ 22 (9th Dist.), citing *In re M.R.*, 2022-Ohio-2209, ¶ 31 (7th Dist.).

{¶ 32} As previously set forth, the hearing commenced with a discussion regarding the GAL's failure to file a report in compliance with the rule. Father's counsel's statement that he "echo[ed] his colleagues sentiments" was not an equivocal objection where counsels' opinions ranged from objecting, disappointed but desirous to proceed, to waiving the GAL report's filing. Even construing counsel's statement as an objection, however, the argument lacks merit.

{¶ 33} In *Short v. Rhodes*, 2021-Ohio-1845, ¶ 72 (6th Dist.), this court observed:

> Sup. R. 48, et seq., provides "good guidelines for the conduct of a guardian ad litem in meeting his or her responsibilities in representing the best interest of a child in order to provide the court with relevant information and an informed recommendation." *In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, ¶ 45 (8th Dist.), quoting *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334, 2013-Ohio-5239, 2013 WL 6221100, ¶ 14. "However, the rules of superintendence are only general guidelines," and "do not create substantive rights in individuals or procedural law." *Id.*, quoting *In re C.O.* at ¶ 14. "As such, it has generally been held that a guardian ad litem's failure to comply with Sup.R. 48 is not, in and of itself, grounds for reversal of a custody determination." *Id.*

{¶ 34} Here, the GAL filed two reports with the juvenile court during the proceedings, both predating father's involvement. At trial, the GAL presented no testimony as to father, and father's attorney did not cross-examine the GAL. Upon review, father has failed to demonstrate any prejudice resulting from the GAL's failure to file a report prior to the hearing. Father's second assignment of error is not well-taken.

11.

{¶ 35} In father's first assignment of error, he contends that his due process rights were violated by the juvenile court's award of permanent custody to HCDJFS because the agency failed to use reasonable efforts to locate him or investigate his fitness to parent T.C.R.

{¶ 36} A decision to terminate parental rights in a permanent custody case will not be reversed unless it is against the manifest weight of the evidence. *In re L.H.*, 2022-Ohio-3263, ¶ 20 (6th Dist.), citing *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.). "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 2023-Ohio-1663, ¶ 27 (6th Dist.), citing *In re T.J.*, 2021-Ohio-4085, ¶ 40 (6th Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997).

{¶ 37} "As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony." *In re W.M.*, 2022-Ohio-1978, ¶ 42 (6th Dist.). "Thus, 'in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" (Citations omitted.) *Id.*

{¶ 38} R.C. 2151.414 sets forth a two-prong analysis the juvenile court must apply when ruling on a motion for permanent custody. *In re R.A.*, 2022-Ohio-1748, ¶ 33 (6th Dist.). "The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least

12.

one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's

best interest is served by granting permanent custody to the agency." *In re A.W.*, 2023-

Ohio-166, ¶ 55 (6th Dist.). The court's findings under R.C. 2151.414 must be supported

by clear and convincing evidence. *In re R.A.* at ¶ 33.

{¶ 39} Here, the juvenile court found that R.C. 2151.414(B)(1)(a) and (d) applied

to mother and both fathers.  The factors provide:

> (a) The child is not abandoned or orphaned, has not been in the temporary
> custody of one or more public children services agencies or private child
> placing agencies for twelve or more months of a consecutive twenty-two-
> month period, or has not been in the temporary custody of one or more
> public children services agencies or private child placing agencies for
> twelve or more months of a consecutive twenty-two-month period if, as
> described in division (D)(1) of section 2151.413 of the Revised Code, the
> child was previously in the temporary custody of an equivalent agency in
> another state, and *the child cannot be placed with either of the child's*
> *parents within a reasonable time or should not be placed with the child's*
> *parents.*
> . . .
> (d) The child has been in the temporary custody of one or more public
> children services agencies or private child placing agencies *for twelve or*
> *more months of a consecutive twenty-two-month period*, or the child has
> been in the temporary custody of one or more public children services
> agencies or private child placing agencies for twelve or more months of a
> consecutive twenty-two-month period and, as described in division (D)(1)
> of section 2151.413 of the Revised Code, the child was previously in the
> temporary custody of an equivalent agency in another state.

{¶ 40} The court must consider the factors under R.C. 2151.414(E), in

determining whether a child cannot or should not be placed with either parent.  Here, the

court found that under R.C. 2151.414(E)(1), the parents failed to substantially remedy the

conditions which caused the children's removal from the home.  Finally, the court found

13.

under R.C. 4151.414(D), placing T.C.R. in the permanent custody of HCDJFS was in his best interest.

{¶ 41} Father claims that only minimal efforts were made to locate him and determine his fitness to parent T.C.R. The evidence demonstrates, however, that father established paternity shortly following T.C.R.'s birth and that he was the subject of a child-support order, yet he chose to have no relationship with his son who was ten years old at the time of the hearing. Father did not contact HCDJFS until two and one-half years after the case had been pending. His excuse was that he had been traveling with the circus and was previously unable to care for T.C.R. Additionally, a caseworker testified that the agency reached out to a relative of father's but that he was not able to take the children due to advanced age and health concerns.

{¶ 42} Based on the fact that T.C.R. had been in agency custody for over two years, had no relationship with father, and has intense physical and emotional needs, the juvenile court did not lose its way in determining that he should not be placed with father. Further, T.C.R.'s strong desire to stay with his brother, T.R., which was expressed directly to the court during an in-camera interview and his need for stable and secure housing, evidence the court's proper conclusion that it was in T.C.R.'s best interest to award HCDJFS permanent custody. Accordingly, father's first assignment of error is not well-taken.

14.

## IV. Conclusion

{¶ 43} For the foregoing reasons, the judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed and father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                               _____
JUDGE

Myron C. Duhart, J.                               _____

Charles E. Sulek, P.J.                              JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.