[Cite as *In re A.H.*, 2018-Ohio-4381.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.H., D.W.

Court of Appeals No. L-18-1072
L-18-1074

Trial Court No. JC 16258086
JC 17262371

**DECISION AND JUDGMENT**

Decided: October 29, 2018

* * * * *

Melody R. Wilhelm, for appellant, De.W.

Matthew P. Mundrick, for appellant, J.N.

Jill E. Wolff, for appellee.

* * * * *

**JENSEN, J.**

{¶ 1} This is a consolidated appeal from judgments of the Juvenile Division of the Lucas County Court of Common Pleas awarding permanent custody of A.H. (born 1/21/10) and D.W. (born 1/21/11) to Lucas County Children Services ("LCCS"), terminating the parental rights of the biological parents, and denying a third party-

complaint for legal custody filed by a maternal great-grandmother. For the reasons that follow, we affirm the decisions of the trial court.

{¶ 2} S.H. is the biological father of A.H.

{¶ 3} De.W. ("Father") is the biological father of D.E.

{¶ 4} S.O. ("Mother") is the biological mother of A.H. and D.E. (collectively "the children").

{¶ 5} J.N. ("Great-Grandmother") is the maternal great-grandmother of the children.

{¶ 6} Neither S.H. nor Mother are parties to this appeal.

{¶ 7} This case originated in April, 2015, when the court granted interim temporary custody of the children to LCCS. Concerns at the time of removal included mental health and substance abuse issues for Mother and Father. The biological parents were offered case plan services but little progress was made. On July 21, 2016, LCCS awarded legal custody of the children to Jackie Biddle. Biddle died a few months later. LCCS was once again awarded temporary custody of the children. The trial court approved a case plan with a goal of reuniting the children with their biological parents.

{¶ 8} On February 13, 2017, LCCS filed a motion for permanent custody. In regard to Father, the motion alleged that he had been offered "dual assessments, substance abuse treatment and mental health treatment, case management services, and visitation" since April 2015. The complaint further alleged that at the time Father was "incarcerated at Mansfield Correctional Institution. He was found guilty of Burglary and was originally sentenced to CTF. He violated his community control by testing positive

2.

for drugs and alcohol and was sentenced to two and half years." LCCS alleged that Father had not completed any case plan services. Father was served with a copy of LCCS's motion.

{¶ 9} On April 26, 2017, Great-Grandmother filed a motion to intervene alleging that she was "willing and able to care for her great-grandchildren and meet all of their emotional and financial needs." Great-Grandmother's motion to intervene was denied on April 27, 2017.

{¶ 10} On the same day she filed a motion to intervene, Great-Grandmother also filed a third-party complaint for legal custody of the children. A copy of the complaint was served on all parties.

{¶ 11} On July 26, 2017, Great-Grandmother filed a motion for visitation alleging that her home study was approved by LCCS, that she had "had regular visitation and possession of the children in her home previously and is *in locus parentis*," and that she has a "close bond with the children" A copy of the motion was served on all parties.

{¶ 12} On August 23, 2017, the trial court issued notice to all parties that a "Permanent Custody Trial" was set to commence October 6, 2017.

{¶ 13} Father was conveyed from the Mansfield Correction Facility to appear before the trial court on October 2, 2017, with counsel. Upon conveyance, Father voluntarily executed a "Permanent Custody Agreement and Waiver of Rights to Hearing" form stipulating to the facts alleged in LCCS's motion for permanent custody and waving his right to a hearing on the motion.

3.

{¶ 14} On October 6, 2017, the trial court scheduled a hearing on Great-Grandmother's motion for visitation and postponed the Permanent Custody Trial until February 5-7, 2018.

{¶ 15} On November 1, 2017, the trial court heard evidence on Great-Grandmother's motion for visitation. The motion was denied.

{¶ 16} On February 5, 2018, the trial court commenced a hearing on Great-Grandmother's third-party complaint for custody and LCCS's motion for permanent custody.

{¶ 17} On March 5, 2018, the trial court issued a judgment entry denying Great-Grandmother's third-party complaint and granting LCCS's motion for permanent custody. Father and Great-Grandmother now appeal. Father asserts two assignments of error for our review:

I. The trial court erred in accepting the surrender of Appellant's parental rights when such surrender was not made knowingly and intelligently.

II. The trial court committed reversible error in finding permanent custody was in the best interest of the minor children when such a finding was against the manifest weight of the evidence.

Great-Grandmother asserts one assignment of error for our review:

I. The Trial Court committed reversible error when it awarded permanent custody of the children to LCCS when it was demonstrated by

4.

clear and convincing evidence that it was in the best interest of the children to award legal custody to their great-grandmother.

## Father's First Assignment of Error

{¶ 18} In his first assignment of error, Father asserts that at the time he executed the "Permanent Custody Agreement and Waiver of Rights to Hearing" form, the trial court failed to mention or discuss the relevancy of Great-Grandmother's pending third-party complaint for legal custody. Father alleges that this failure is incompatible with the trial court's obligation to engage in "meaningful dialog" in determining whether he freely and voluntarily entered into the agreement.

{¶ 19} "'In a case where parental rights are permanently terminated, it is of utmost importance that the parties fully understand their rights and that any waiver is made with full knowledge of those rights and consequences which may follow.'" *In re Rock Children*, 5th Dist. Stark No. 2004CA00358, 2005-Ohio-2572, ¶ 17, quoting *Elmer v. Lucas Cty. Children Servs. Bd.*, 36 Ohio App.3d 241, 245, 523 N.E.2d 540 (6th Dist.1987). When accepting a parent's stipulation to permanent custody, a trial court must comply with Juv.R. 29(D). *In re J.F.*, 9th Dist. Wayne No. 15AP058, 2016-Ohio-1285, ¶ 11, citing, *In re Rock Children* at ¶ 12; *In re C.P.*, 8th Dist. Cuyahoga No. 91393, 2008-Ohio-4700; *In re Foresha/Kinkel Children*, 5th Dist. Stark No. 2003CA00364, 2004-Ohio-578.

{¶ 20} Juv.R. 29(D) requires the trial court to ascertain "(1) The party is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission; [and] (2) The party understands that by entering an

5.

admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing."

{¶ 21} The record indicates that on October 2, 2017, Father executed a written "Permanent Custody Agreement and Waiver of Rights to Hearing" form stipulating to the facts alleged in LCCS's motion for permanent custody. By executing the form, Father asserted, among other things, that he was represented by counsel; that he discussed the case with his counsel; that he voluntarily agreed to his child being placed in the permanent custody of LCCS; that he understood his parental rights would be terminated and that his relationship with his child would end; that he was waiving his right to a contested hearing during which LCCS would be required to prove its case by clear and convincing evidence; that he was knowingly waiving his parental rights without any threats or promises by anyone; and that he agreed that permanent custody was in the best interest of his child.

{¶ 22} After Father signed the form, the trial judge questioned Father about the stipulation and his relinquishment of parental rights. Through affirmative responses to the trial judge's questions, Father indicated, among other things, that he understood that by signing the agreement he was no longer entitled to participate in the hearing on LCCS's petition for permanent custody. Father affirmatively indicated that he went over all of his rights with his counsel and that he understood them. Father also affirmatively indicated that it was in his child's best interest that LCCS be granted permanent custody.

{¶ 23} We find no merit in Father's argument that the trial court was required to discuss Great-Grandmother's pending motions during the Juv.R. 29(D) colloquy. The

6.

record indicates that Father's counsel was served with copies of Great-Grandmother's pleadings at the time they were filed. There is nothing in the record that would suggest Father misunderstood the consequences of his stipulation. Father relinquished his parental rights freely, voluntarily, and with the advice of his counsel. Father's first assignment of error is not well-taken.

**Father's Second Assignment of Error**

{¶ 24} In his first argument under his second assignment of error, Father asserts that the trial court erred when it awarded permanent custody to LCCS because LCCS did not make any effort to contact Father after he was released from incarceration in November 2017. We find no merit in Father's argument. Father stipulated to a termination of parental rights on October 2, 2017, more than a month before his release. Thus, LCCS was under no obligation to pursue case plan services in November 2017. Appellant's first argument under his second assignment of error is not well-taken.

{¶ 25} In his second argument under his second assignment of error, Father asserts that the trial court erred when it relied on Father's waiver of parental rights in granting LCCS's motion for permanent custody.

{¶ 26} Pursuant to R.C. 2151.414(E), if the trial court determines, by clear and convincing evidence, that one or more of the factors listed in R.C. 2151.414(E)(1)-(16) exists as to each of the child's parents, then the trial court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738, at syllabus.

7.

**{¶ 27}** In this case, the trial court found, among other factors, that R.C. 2151.414(E)(1) applied to Mother and Father.  R.C. 2151.414(E)(1) provides:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 28}** Limiting our review of the circumstances involving Father, we find the record contains clear and convincing evidence that Father "has failed continuously and repeatedly to substantially remedy" the conditions that caused D.W. to be placed outside the home.  Initially, the children were placed in the care and custody of LCCS because of "concerns for substance abuse and mental health of the parents, criminal concerns for the parents, and the death of a caretaker."  When he executed the "Permanent Custody Agreement and Waiver of Rights to Hearing" form, Father stipulated that the facts alleged in LCCS's motion for permanent custody were true.  In so doing, he stipulated

8.

that he failed to successfully complete services that included dual assessments, substance abuse treatment and mental health treatment, case management services and visitation.

{¶ 29} In its March 5, 2018 judgment entry granting LCCS's motion for permanent custody, the trial court specifically held that Father "uses Heroin and alcohol" and that "all of the parents have chronic substance abuse issues so severe that it makes them unable to provide an adequate permanent home now or within one year of the permanent custody trial." The trial court further held that "[Mother] and [Father] have repeated incarcerations that make them unable to provide care for the children." Evidence presented at the hearing on LCCS's motion for permanent custody supports the trial court's findings. Father's second argument under his second assignment of error is not well-taken.

{¶ 30} In his third argument under his second assignment of error, Father asserts that the trial court erred by failing to place the children in the legal custody of Great-Grandmother. In response, the state cites *In re S.C.*, 8th Dist. Cuyahoga No. 106701, 2018-Ohio-2523, ¶ 16, for the proposition that "[a] parent has no standing to assert that the court abused its discretion by failing to give [Great-Grandmother] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper." *Id.*, quoting *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 23 (Citations omitted). Thus, Father's challenge to the trial March 5, 2018 judgment entry is limited to whether the trial court improperly terminated his parental rights. Father's third argument under his second assignment of error is not well-taken.

9.

**Great-Grandmother's Assignment of Error**

{¶ 31} In her sole assignment of error, Great-Grandmother disputes the trial court's finding that it was in the best interest of the children to grant permanent custody to LCCS.

{¶ 32} Here, it is important to note that there were two issues pending before the court at the hearing that commenced on February 5, 2018: LCCS's motion for permanent custody and Great-Grandmother's Third-Party Complaint for Legal Custody. Great-Grandmother is not a party to LCCS's motion for permanent custody. Thus, the only issue before the court on Great-Grandmother's appeal is whether the trial court erred in denying her Third-Party Complaint for Legal Custody – a request the trial court referred to in its March 5, 2018 judgment entry as a "motion for legal custody."

{¶ 33} Great-Grandmother testified in support of her motion for legal custody. She also presented testimony from Monica Campbell and David McCully.

{¶ 34} Monica Campbell testified that she is a relative of Mother on her mother's side. She first became acquainted with the children when Jackie Biddle died. Ms. Campbell testified that if Great-Grandmother were to obtain legal custody of the children, she would assist Great-Grandmother with "whatever she needed. Whether it be taking them to doctors, baby-sitting them, whatever it may be, I will be there for those children."

{¶ 35} David McCully testified that he is an attorney in the areas of "juvenile criminal defense, divorce work, personal injury and worker's comp." He testified that he

10.

first met Great-Grandmother in 1984 or 1985 through her husband. He knows Great-Grandmother professionally and personally. When asked whether he believed Great-Grandmother would be capable of raising the children, Mr. McCully said, "I do * * * I've known [Great-Grandmother] for a long time. Probably if my children were still minor children, I would trust her with watching them or taking care of them." Mr. McCully indicated that he believed that Great-Grandmother has appropriate housing available to raise the children. He further indicated that he had never represented Great-Grandmother in any criminal or child abuse matters.

{¶ 36} On cross-examination, Mr. McCully admitted he never met the children and never saw Great-Grandmother interact with the children. When Mr. McCully was questioned about a 2003 sexual abuse finding against Great-Grandmother, he indicated he was unaware of the circumstances but that it caused him "concern." When Mr. McCully was questioned about a 2006 neglect finding against Great-Grandmother relating to her care of two grandsons, he indicated he was unaware of the circumstances but that it too caused him "concern." When Mr. McCully was informed that Great-Grandmother's daughter had once accused someone in the family about sexual abuse, Mr. McCully indicated that he was unaware of the accusation.

{¶ 37} Great-Grandmother testified that when the children were staying with Jacki Biddle, she saw them on a daily basis. After Jacki died, Great-Grandmother was granted supervised visitation. Shortly thereafter, visitation was terminated by LCCS. The last time Great-Grandmother saw the children was at a family funeral in November, 2016.

11.

**{¶ 38}** Great-Grandmother testified that at the time of the hearing, she lived in a three bedroom, furnished home in Pontiac, Michigan. She admitted, however, that the home had not been approved as a home study by LCCS.

**{¶ 39}** Great-Grandmother indicated that she filed the motion for legal custody because she would like to give the children "a good home." Great-Grandmother denied "any proof" of past LCCS referrals regarding her, her children, or her home. In regard to LCCS allegations against a grandson Great-Grandmother was raising, Great-Grandmother admitted she was unable to give LCCS the grandson's contact information because she did not have it and the grandson had moved out of her home.

**{¶ 40}** On cross-examination, Great-Grandmother admitted that she was previously denied custody of the children because her dog had bitten A.H. Great-Grandmother explained, "I took her to the hospital, but it was nothing * * * she didn't bleed or anything like that."

**{¶ 41}** Great-Grandmother indicated that she was not aware of three sexual abuse referrals in 2002 regarding two grandsons in her care. She also denied knowledge of sex abuse referrals regarding the same children in 2003, 2004, and 2005

**{¶ 42}** Great-Grandmother admitted that she reported her own daughter was sexually abused by an uncle when she was a child. Great-Grandmother indicated that the uncle was accused of abusing "all the children, not just one," but that there was "no proof of nothing." Great-Grandmother denied minimizing the "behavior" and denied "taking part" in perpetrating or covering up any of the alleged abuse.

12.

**{¶ 43}** Great-Grandmother denied any knowledge of allegations that A. H. was sexually abused by Great-Grandmother's grandson while A.H. was in her home.

**{¶ 44}** At the hearing, the guardian ad litem indicated that none of the parents had successfully completed case plan services. The guardian ad litem testified that she conducted an independent investigation and that based on that investigation, permanent custody to LCCS was in the children's best interest. Specifically, the guardian ad litem testified, "I feel like they're getting a lot of very – intense help and support, and the safe environment they need." She further indicated that a grant of legal custody to Great-Grandmother was not in the best interest of the children. She explained,

> I feel that throughout my interactions on the case there have just
> been questions of judgment, whether it was allowing the parents to see the
> kids when they weren't supposed to be seeing the kids, you know, outside
> of doing their services, or other things that I've heard or found out through
> my investigation that caused me to question some of the judgments.

In regard to D.W., the guardian ad litem stated that he "hasn't really been able to express his wishes to me, but he does seem very happy where he is. He seems connected with the [foster] parents and almost jovial when I'm there. And * * * he seems to * * * really feel safe in that environment." In regard to A.H., the guardian ad litem indicated that in the spring of 2017 A.H. had expressed a preference to live with her parents, but that in July, 2017, A.H. came to her and indicated that while she missed Mother, she wanted to live with her foster parents.

13.

{¶ 45} The caseworker of record testified that in her opinion, permanent custody to LCCS was in the best interest of the children. She testified that Great-Grandmother had had only had three supervised visits with the children, and that after the visits, the children "acted out." The caseworker testified that the children are very bonded to each other and they have special needs that are being addressed by counseling. She indicated that the children deserve a safe, stable home, and that and they are in need of a legally secure permanent placement.

{¶ 46} In its March 5, 2018, the trial court specifically held that it considered all of the best interest factors contained in R.C. 2151.414(D)(1) when it concluded that it was in the children's best interest that that permanent custody be awarded to LCCS. These factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

14.

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 47} In its judgment entry, the trial court concluded that it did not find "credible sufficient evidence" to support Great-Grandmother's motion for legal custody.  We find no error in the trial court's conclusion.  Great-Grandmother's assignment of error is not well-taken.

**Conclusion**

{¶ 48} On consideration, the judgment of the Lucas County Court of Common Pleas, Juvenile Division is affirmed.  Father's first and second assignments of error are not well-taken.  Great-Grandmother's sole assignment of error is not well-taken.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                    _____
                                                                JUDGE
James D. Jensen, J.

Christine E. Mayle, P.J.               _____
CONCUR.                                             JUDGE

                                                       _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.