**[Cite as *In re A.W.*, 2023-Ohio-166.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.W.

Court of Appeals No. L-22-1209

Trial Court No.  20280998

**<u>DECISION AND JUDGMENT</u>**

Decided:  January 20, 2023

* * * * *

Anthony R. McGeorge, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal by appellant, the mother of A.W., from the August 29,

2022 judgment of the Lucas County Court of Common Pleas, Juvenile Division, granting

permanent custody of A.W. to appellee Lucas County Children Services ("LCCS" or "the agency"). For the reasons that follow, we affirm the judgment.

{¶ 2} Appellant sets forth one assignment of error:

The trial court's finding that the child cannot not be placed with his mother within a reasonable time or should not be placed with his mother pursuant to R.C. 2151.414(B)(1)(a) was not supported by clear and convincing evidence.

**Background**

{¶ 3} Appellant is the mother of A.W., who was born in May 2020 in Arizona. Two potential fathers of A.W. were identified; one man was excluded as the biological father of A.W., and the other man failed to take a paternity test. Thus, the child's paternity has not been established. The alleged father is not involved in the proceedings.

{¶ 4} By the time A.W. was 12 weeks old, he had lived in Arizona, Indiana and Ohio with appellant. On August 11, 2020, appellant and the child were in Toledo, Ohio, when LCCS received a referral that appellant, who was homeless, threw the child onto a couch and threatened to kill herself and the child. Appellant was taken to a hospital and "pink-slipped," while A.W. was transported to another hospital for a welfare check. The police then took the child to the agency.

{¶ 5} That same day, LCCS filed a complaint in dependency and neglect with respect to A.W., a shelter care hearing was held and LCCS was awarded interim

2.

temporary custody of the child. A.W. was placed in a foster home, while appellant remained in the Toledo area, living in a homeless shelter after she was released from the hospital.

{¶ 6} On September 29, 2020, an adjudication hearing was conducted, and appellant stipulated that A.W. was a dependent and neglected child. A dispositional hearing was immediately held where the parties agreed to award temporary custody of A.W. to LCCS.

{¶ 7} In November 2020, appellant moved to Cleveland, Ohio.

{¶ 8} On June 3, 2021, LCCS filed a motion for permanent custody of A.W. Also in June 2021, appellant moved to Arizona to live with friends. On July 21, 2021, LCCS dismissed its motion for permanent custody, but filed a motion to extend temporary custody of A.W.; the motion was subsequently granted.

{¶ 9} In February 2022, appellant moved to Oregon, Ohio, to be closer to A.W. On May 10, 2022, LCCS filed another motion for permanent custody of A.W. On August 15, 2022, a hearing was held. The court issued its judgment entry on August 29, 2022, awarding permanent custody of A.W. to LCCS. Appellant appealed.

### The Hearing

{¶ 10} The agency called three witnesses to testify at the permanent custody hearing, two caseworkers and the Court Appointed Special Advocate ("CASA"). Appellant also testified at the hearing. The relevant testimony is summarized below.

3.

## Caseworker Tiffany LaPlante

{¶ 11} LaPlante testified she is employed by LCCS and was the ongoing caseworker for A.W. from the time he came into care until November 2021. No father was identified for the child, although appellant named two men as alleged fathers. One man took a paternity test and was excluded, while the other man did not follow through with paternity testing.

{¶ 12} LaPlante recalled that appellant's case plan services included obtaining stable housing, following through with mental health services and engaging in parenting. Appellant participated in mental health services in Toledo, from September 2020 through November 2020, and she was diagnosed with major depressive disorder. She participated in counseling services on and off, and medication management.

{¶ 13} In November 2020, appellant moved to Cleveland, Ohio, where she engaged in therapy; sometimes her attendance was consistent, sometimes it was not. While in Cleveland, there was a major concern for suicidal ideation, so appellant's counselor would call LaPlante. The counselor said she feared for appellant's safety and believed appellant was not taking her medication as prescribed. Neither LaPlante nor the counselor was able to obtain appellant's address in order to do well-checks. Appellant made some strides forward with her treatment, and several strides backwards.

{¶ 14} In June 2021, appellant moved to Arizona, and she notified LaPlante. Appellant had mental health services and a parenting program set up there, and she was consistent with attending those for the five months LaPlante remained on the case.

{¶ 15} Regarding housing, LaPlante testified appellant lived in a homeless shelter while in Toledo, and upon moving to Cleveland, she briefly stayed with A.W.'s alleged father. Appellant would tell LaPlante when she moved, as appellant would stay with a new friend every few weeks, but appellant would not provide the addresses. When appellant moved to Arizona, she informed LaPlante that she wanted to stay with her biological family. LaPlante testified appellant had stable housing for the five months that LaPlante remained on the case.

{¶ 16} With respect to visits between appellant and A.W., LaPlante noticed several concerning behaviors before appellant participated in the parenting program, one of which was when appellant took the child outside to a pond and was holding him over the water. After that, two people were required to provide supervised visitations.

{¶ 17} A.W. was referred to Help Me Grow, just as LaPlante was leaving the case, as he was not meeting some of his milestones, like speech and how he was walking. A.W. was referred for an occupational therapy assessment and a speech assessment. The therapies were recommended, and A.W. engaged in those therapies.

{¶ 18} LaPlante described appellant as being very active and playing an active role in trying to be involved in A.W.'s life, but there was a concern for appellant's behavior

5.

being erratic. Sometimes, due to the way appellant handled situations at the caregivers' home, she would be asked to leave. There were also concerns with appellant maintaining her composure at A.W.'s doctor and hospital appointments. LaPlante believed it was in A.W.'s best interest to remain with his caregivers.

**Caseworker Delisha Osley**

{¶ 19} Osley testified she is employed by LCCS and was the ongoing caseworker for A.W. starting in November 2021, at which time appellant was residing in Arizona. Appellant moved to Oregon, Ohio, in early February 2022. To Osley's knowledge, appellant was only engaged in parenting services while in Arizona, not mental health treatment, and appellant had housing but was not employed.

{¶ 20} When appellant returned to the Toledo area, it took her some time to engage in mental health treatment. While appellant was compliant with her treatment, she was not consistent, as she cancelled some appointments and was a no-show for others. Appellant was also not compliant with her case plan as to parenting because she did not complete interactive parenting services.

{¶ 21} Osley testified appellant had been living at homeless shelter and in her car, on and off. Appellant was discharged from the homeless shelter because she did not check in every day, as required. Appellant told Osley she failed to check in because she was working 31-hour days as a home health aide. Osley noted appellant had stable housing for two and a half months, and was living with someone named Drew. Osley

6.

tried to look up Drew, but he was not in the agency's system and Osley did not perform a criminal background check of Drew. Osley did not feel the housing was appropriate for A.W., because Drew stayed in one room while appellant stayed in the other room, so there was no room for A.W. Appellant said A.W. would have his own room, and she and Drew would alternate sleeping in her bedroom.

{¶ 22} Osley observed four parenting interactions between appellant and A.W. in four different settings, and had concerns. At the caregivers' home, appellant put all of A.W.'s food in front of him and he would put all of it in his mouth, which was a choking hazard. Appellant gave A.W. coffee, so the caregiver explained to appellant that because of his age and digestive system, he could not have coffee; the caregiver turned her back and appellant gave the child coffee anyway.

{¶ 23} At the library, appellant had a difficult time redirecting and soothing A.W.; she put him on her shoulders, which he did not like, so he would scream. Appellant had to be told to put A.W. down, but she continued to keep him on her shoulders. At a gymnastics center, A.W. took equipment from another child, but appellant did not correct A.W. by explaining to him that he had to take turns. At the agency, appellant gave A.W. kiwi with the skin on, which A.W. "pouched" or put in his cheek; this was a choking hazard.

{¶ 24} When Osley explained her concerns, appellant would often be defensive. One time, appellant said some people may find Osley's parenting style concerning.

7.

{¶ 25} Osley believed appellant had not learned enough from the parenting program to be a successful parent, and based on what appellant told Osley, appellant did not feel she got what she needed out of the first parenting class.

{¶ 26} Osley recalled A.W. was still engaged in case plan services, including speech therapy and he had to be tested for autism. Osley noted A.W. has been in the agency's temporary custody for 23 months.

{¶ 27} Osley opined that overall, appellant has made progress with her case plan services, but not far enough along as Osley would like to see in two years. Ideally, case plans are supposed to be completed in one year.

{¶ 28} Osley did not recommend extending appellant's time to complete case plan services, as Osley believed permanent custody was in A.W.'s best interest, because A.W. has been doing well in his current placement, and he has made significant progress.

### Court Appointed Special Advocate

{¶ 29} Mary Bohnett testified she was the CASA assigned to represent A.W. on March 23, 2022. Bohnett conducted an investigation by reviewing documents and interviewing people including appellant.

{¶ 30} The CASA testified appellant was very hospitable, but there were many concerns with appellant's future planning and plans for A.W. Appellant was initially living in a homeless shelter, then moved to an apartment in Oregon, Ohio, where she had lived for two and a half months, as of the time of the hearing, which is the longest period

8.

of time she had lived in one place. However, appellant's roommate was concerning because nothing is known about him and he also appears to be a transient person. In addition, the apartment complex is in a very high crime area, and appellant acknowledged she always hangs around the wrong people.

{¶ 31} Bohnett described A.W. as a typical two year old in some ways, yet very busy and challenging, as he wants things right when he wants them. A.W. had been in the same home during the time Bohnett was on the case, and his level of understanding and his speech improved. A.W.'s interaction with his caregivers is very loving and nonthreatening, his needs are met and he looks to them for comfort and safety. The caregivers' son and daughter-in-law are interested in adopting A.W.

{¶ 32} The CASA recalled that appellant identified the caregivers as her parents and relatives because appellant has known the caregivers since she was about 14 years old. Appellant met the caregivers when she was in foster care herself and became friends with the caregivers' daughter. Appellant would stay over at the caregivers' home for the weekend, then for a week. The caregivers have always been there to support appellant.

{¶ 33} Appellant used to visit A.W. at the caregivers' house, but there was an issue and a confrontation which escalated, so the caregivers decided they wanted appellant to see A.W. at the agency.

9.

**{¶ 34}** Bohnett did not believe appellant's mental health was stable enough to provide a permanent home for A.W., as there were inconsistencies in appellant's mental health.

**{¶ 35}** The CASA did not feel appellant's interactions with the child were appropriate, as A.W. had a difficult time leaving his caregiver to go to appellant, and although A.W. sat on appellant's lap, there was no type of affection like hugging or kissing between them.

**{¶ 36}** Bohnett has concerns about appellant's "flight kind of thinking," like appellant talking about her underwear and swimming with A.W., but when asked, appellant said she did not go swimming with him. The CASA recalled a time when appellant was writing on the wall, and A.W. was running around. Bohnett testified there were times when appellant engaged with A.W., but it was not consistent. Bohnett stressed the lack of intimacy, the lack of love towards A.W.

**{¶ 37}** The CASA believed if appellant were granted custody of A.W., appellant would not be able to keep him safe or meet his basic needs, because appellant could not meet her own needs. Bohnett authored a report, filed August 1, 2022, in which she recommended it was in A.W.'s best interest that permanent custody be awarded to the agency. Bohnett opined A.W. would be in imminent risk of harm due to being around appellant's roommate, who was transient, and due to the challenges A.W. faced with his special needs.

10.

**Appellant**

{¶ 38} Appellant testified she moved to Arizona because she was offered housing and employment, and she was hoping "they would send [A.W.] out there." Appellant engaged in case plan services in Arizona by seeing a counselor and a psychiatrist, who prescribed medicine for anxiety to be taken as needed, and completing a 90-day parenting class. Appellant worked with people with special needs in group homes, and maintained housing. Appellant would come back to Toledo to visit once a month, sometimes twice a month.

{¶ 39} Appellant recalled she had A.W. in Arizona, she moved to Indiana, and she moved to Toledo when A.W. was "like, 12 weeks old. And shit happened. I -- I'm sorry, stuff happened." She described having a postpartum episode and going to St. Charles Hospital in August 2020. After she was released from the hospital, she stayed at a homeless shelter until about November 2020. A friend offered appellant housing, so she moved to Cleveland, but "[t]hings didn't work out because * * * I don't deal with dudes very much and people being weird." Appellant moved to a homeless shelter in Cleveland, then she went to her friend's house and "hung out with him and his kids for, like, about a month. And then I didn't feel comfortable." Appellant went to Bedford with her friend, Anthony.

{¶ 40} Appellant testified she was currently working with a counselor at Zepf Center and she requested parenting classes; she is waiting on him to get back to her.

11.

Appellant visits A.W. once a week at the agency. Appellant does not expect for her services to be over, as she feels like she needs counseling as "right now I'm working on me, and I'm working on, like, not just with the kid, but I'm working on stuff from past, like, growing up and just past traumas, life." Appellant said, "I want to continue to work on getting my son. * * * I know what I need to do to make things right. I mean, I am not hard on myself, but I'm logical. I'm a logical thinker, and therefore I feel that needs to be done as far as anything for me to see my son. I've been thinking about school and just other stuff like that."

{¶ 41} Appellant explained with respect to choking hazards for A.W., "[t]hey had a lot of concern about that. Because me, I haven't had any other kids before him. I'm 38 and unfortunately I have no other kids at 38. I didn't know that kids couldn't have, like, grapefruit or anything." Appellant was asked if she would be able to parent A.W. and she replied, "I think I will be able to with help. The reason being is because right now actually for my job I do work a lot. Oh, yes, that's what happened. I'm sorry. The way my mind works, I kind of remember when --."

{¶ 42} Appellant was questioned about the 31-hour work day remark, and she responded that she did not call the homeless shelter because she was so caught up in work. She said, [a] lot of people started quitting around that time, and everyone kept calling me. And I said, okay, I don't mind. I'm just living there, and basically here all the time. * * * You can only work 24 hours max, and I work every day from * * * 7 PM

12.

to 7 AM now.  But I was doing both days and nights before and * * * I was never living in my car.  I was living in a hotel, but I did consider living in a car."

{¶ 43} Appellant was redirected and asked again about parenting A.W. with help and she stated, "because of my work schedule until he's old enough to do schooling and all that.  I think just needing help with finding a good daycare, finding a good -- somewhere [sic] to be with him during the day.  Because I work from night to morning.  I get off work at 7 AM.  So I'm just, like, okay, who can spend time with him while I take a nap?  Because I can't just not sleep.  So I'm, like, okay, who can?  So that's the help that I was talking about.  Like, okay, where did he go [sic]?"

{¶ 44} The court questioned appellant about visits with A.W., and appellant said she mostly visited him by video chat, but she would also come Toledo.  Appellant stated, "So we made arrangements where I would go by their [the caregivers and caseworker's] time. * * * I'd take the Greyhound up and visit him * * * it might have been once every two weeks or once -- I don't know.  I don't really recall.  But I can call Greyhound and figure it out."  When appellant was in Arizona, she would come to Toledo to visit A.W. once a month, but she "would video chat with him daily almost."

## Juvenile Court's Decision

{¶ 45} On August 17, 2022, the court verbally announced its decision that the agency met its burden, by clear and convincing evidence, it was in A.W.'s best interest for permanent custody to be granted to the agency.  The court relied on R.C.

13.

2151.414(E)(1) and (4) as to appellant, and R.C. 2151.414(E)(10) as to the alleged father who abandoned the child.

{¶ 46} On August 29, 2022, the court issued its judgment entry granting permanent custody of A.W. to the agency. The court detailed the testimony and evidence offered at trial, upon which it relied in reaching its findings of fact and conclusions. In its findings of fact, the court outlined and addressed each of the case plan services offered to appellant, and noted her involvement with each service as well as the concerns and struggles attendant to each service. The court also discussed appellant's visitation with the child. The court set forth A.W.'s case plan services, his placement and well-being.

{¶ 47} The court found, pursuant to R.C. 2151.414(B)(1)(d), that based on A.W.'s custodial history, he has been in LCCS's temporary custody for 19 months of a consecutive 22-month period.

{¶ 48} The court further found, under R.C. 2151.414(E)(1), notwithstanding reasonable case planning and diligent efforts by LCCS to assist appellant, she failed continuously and repeatedly to substantially remedy the conditions causing A.W. to be placed outside of the home. The court noted appellant's struggles with her mental health, her tangential thinking and the assistance she required to successfully parent the child.

{¶ 49} The court found, under R.C. 2151.414(E)(4), appellant demonstrated a lack of commitment toward A.W. by failing to regularly support, visit or communicate with him, when able. The court noted appellant was inconsistent with her housing, as she "has

14.

been roaming from state to state for some time," she has been homeless, and has relied on the generosity of others. The court observed that although appellant currently has housing, LCCS is unable to verify whether the individual who she is living with is appropriate.

{¶ 50} The court found it was in A.W.'s best interest to grant permanent custody to LCCS, as A.W. has positive interactions with his caregivers, he is bonded to them, and they wish to keep A.W. as part of their family. The court noted the CASA testified to seeing little to no connection between appellant and A.W.

{¶ 51} The court also observed appellant had a difficult time parenting A.W., and appellant acknowledged she would need help being a full-time parent to the child. The court found this was impractical, especially because A.W. has some special needs.

{¶ 52} The court noted A.W. was too young to express his wishes, however the CASA testified it would be in his best interest that permanent custody be awarded to LCCS.

{¶ 53} The court found A.W. deserves a legally secure permanent placement, but appellant will not be able to provide a permanent home for him at this time or the foreseeable future. The court noted a child need not wait forever for a parent to alleviate the reasons for removal. The court found that unfortunately appellant made little to no appreciable progress in her case plan services. The court concluded a legally secure

15.

permanent placement for A.W. cannot be achieved without a grant of permanent custody to LCCS.

## The Appeal

## Standard - Permanent Custody

{¶ 54} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "The underlying rationale of giving deference to the findings of the juvenile court rests with the knowledge that the juvenile judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Therefore, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 55} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of

16.

at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4).

{¶ 56} R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." R.C. 2151.414(B)(1)(d) states that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period."

{¶ 57} R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of R.C. 2151.414(E)(1) - (16) is present.

{¶ 58} To satisfy the best interest prong of the permanent custody test, the agency must establish, by clear and convincing evidence, that permanent custody to the agency is in the best interest of the child based on an analysis under R.C. 2151.414(D). The juvenile court must consider all relevant factors, including: the interaction and interrelationship of the child with parents, siblings, relatives and foster caregivers; the custodial history of the child; and, the child's need for permanence. *See* R.C. 2151.414(D)(1)(a), (c) and (d).

{¶ 59} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

17.

established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In order to determine whether a juvenile court based its judgment on clear and convincing evidence, the reviewing court examines the record to decide whether the trier of fact had sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

### Assignment of Error

{¶ 60} Appellant argues LCCS failed to meet its burden of proving, by clear and convincing evidence, that A.W. cannot be placed with her within a reasonable time and should not be placed with her. Appellant asserts the juvenile court's finding that she had not utilized all of the resources available to her to address the reasons A.W. was removed, specifically mental health, parenting and housing resources, was not supported by clear and convincing evidence.

{¶ 61} Appellant contends A.W. was removed from her care due to a postpartum episode that she experienced, which resulted in her being hospitalized for a few days. Upon being released from the hospital, she went to a homeless shelter and participated in case plan services in Toledo, then in Cleveland, then in Arizona, then in Oregon, Ohio. While in Arizona, appellant visited with the child by travelling to Ohio or via video chat. At the time of trial, appellant had maintained stable housing for two and half months, she had completed parenting classes in Arizona and she was engaged with the Zepf Center and was pursuing parenting classes through Zepf.

18.

{¶ 62} Appellant submits the agency did not prove, by clear and convincing evidence, that she failed continuously and repeatedly to substantially remedy the conditions which caused the child to be placed outside of the home.

{¶ 63} Appellant further argues the court's finding that she demonstrated a lack of commitment toward A.W. by failing to regularly support, visit or communicate when she was able to do so, was not supported by clear and convincing evidence. Although appellant moved several times, she travelled regularly to visit the child and/or used video visits to see him and/or communicate with him. When she returned to the Toledo area in February 2022, appellant visited with A.W. and worked full-time.

{¶ 64} The agency counters the court's decision was supported by clear and convincing evidence and is not against the weight of the evidence. The agency asserts appellant did not dispute the trial court's findings under R.C. 2151.414(B)(1)(d), that A.W. has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. The agency contends A.W. has been in its custody since September 29, 2020, so the child was in its custody for 19 months of a consecutive 22-month period at the time the motion for permanent custody was filed. The agency also observes that appellant did not discuss the best interest factors under R.C. 2151.414(D)(1)(d).

**Analysis**

{¶ 65} The juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), A.W. could not be placed with appellant within a reasonable time or should not be placed with her,

19.

and also found R.C. 2151.414(E)(1) and (4) applied.  The juvenile court further found, pursuant to R.C. 2151.414(B)(1)(d), that A.W. had been in LCCS's temporary custody for 19 months of a consecutive 22-month period, when the motion for permanent custody was filed.

{¶ 66} Based on our review of the record, as summarized above, we conclude there is clear and convincing evidence in the record to support the juvenile court's decision that A.W. could not and should not be placed with appellant.  We also conclude there is clear and convincing evidence in the record to support the juvenile court's decision that A.W. has been in LCCS's temporary custody for 19 months of a consecutive 22-month period.

{¶ 67} We further conclude there is sufficient and substantial competent evidence in the record that appellant failed to remedy the problems which initially caused A.W.'s removal.  While appellant participated in case plan services and made some progress in certain areas, her overall progress was insufficient, specifically with respect to parenting A.W. successfully and on her own.  The record shows appellant acknowledged needing help with parenting, and the CASA testified she did not feel A.W. would be safe with appellant, since appellant cannot really care for herself, much less a child.

{¶ 68} We further conclude there is sufficient and substantial competent evidence in the record that appellant demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or

20.

by other actions showing an unwillingness to provide an adequate permanent home for the child. The record reveals appellant's housing situation is inconsistent, as she has been homeless and transient, moving from state to state and city to city, living with different people. And, although appellant had an apartment at the time of trial, the complex was in a high crime area and LCCS was unable to verify whether her roommate was appropriate.

**{¶ 69}** As noted by LCCS, appellant did not present any arguments regarding the best interest factors. Nonetheless, we find the record shows the juvenile court considered the best interest factors, and the evidence in the record supports the juvenile court's conclusion that granting permanent custody of A.W. to LCCS serves his best interest.

**{¶ 70}** Based on the foregoing, appellant's assignment of error is found not-well taken.

**{¶ 71}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.

_____
JUDGE

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.