[Cite as *In re S.S.*, 2023-Ohio-1663.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re S.S.

Court of Appeals No. L-22-1219

Trial Court No.  JC 21282701

<u>**DECISION AND JUDGMENT**</u>

Decided:  May 16, 2023

* * * * *

Anthony R. McGeorge, for appellee.

Adam H. Houser, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant, A.S. ("mother"), appeals the August 23, 2022 judgment of the Lucas County Court of Common Pleas, Juvenile Division, granting appellee Lucas County Children Services' ("LCCS") motion for permanent custody of her minor child, S.S., and terminating her parental rights.  Because the juvenile court's judgment clearly and convincingly supported its determination that permanent custody to LCCS was in S.S.'s best interest, the judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} On January 14, 2021, LCCS filed a complaint in dependency and neglect as to minor, S.S. The complaint alleged that on January 13, 2021, mother, with S.S. present, entered an individual's truck without permission. She exited after being confronted by the owner, who then called the police. Still with S.S., mother entered a nearby apartment, removed her clothing, and sat naked on the couch. When police arrived, mother was found outside urinating and defecating. Mother was then transported to Toledo Hospital for a psychological evaluation. Hospital staff reported that mother attempted to take another person's child. S.S.'s alleged father, S.G., could not be located. S.S. was delivered by police to LCCS.

{¶ 3} At a hearing on January 14, 2021, the juvenile court awarded LCCS interim temporary custody. The court appointed counsel for the parents and assigned S.S. a Guardian ad Litem ("GAL"). It also granted the parents supervised visitation and ordered them to comply with the case plan.

{¶ 4} Reunification of the family was the goal of the original case plan filed on February 18, 2021. The case plan required that mother complete a dual diagnostic assessment and attend domestic violence counseling and parenting classes. Despite LCCS' efforts, father could not be located. He never contacted LCCS and was not included in the case plan. On March 1, 2021, the juvenile court approved the case plan, adjudicated S.S. dependent and neglected, and awarded LCCS temporary custody.

2.

**{¶ 5}** On July 19, 2021, during a reasonable efforts review hearing, testimony was presented that mother had completed the dual diagnostic assessment. She then moved to Connecticut to stay with her mother (maternal grandmother) and planned on completing a second diagnostic assessment and follow-up services with an agency that LCCS had been unable to verify. The LCCS caseworker stated that because mother had not demonstrated mental health stability, domestic violence and parenting classes had not commenced. Also, due to three consecutive missed visits her virtual visitation had been suspended.

**{¶ 6}** On December 6, 2021, LCCS filed an amended case plan reflecting that it removed mother from the case plan after being unable to reach her, that it received information mother moved out of maternal grandmother's residence, and that it was exploring a possible placement with maternal grandfather.

**{¶ 7}** On December 16, 2021, LCCS filed a motion to extend its temporary custody of S.S. in order to conduct an investigation/home study of maternal grandfather. At a hearing on the motion, the LCCS caseworker stated that virtual visitations halted in July 2021, and mother had not requested that they recommence. He explained that S.S. was bonded and doing well with his foster family. The juvenile court granted LCCS' motion finding that the extension of temporary custody was in S.S.'s best interest.

**{¶ 8}** The June 17, 2022 GAL permanent custody report and recommendations provided that mother's virtual visitation attendance was "sporadic" and when she did attend, she was distracted and not engaged with S.S. Due to consecutive "no shows,"

3.

visits were suspended in May 2021 and again in October 2021. The GAL learned that S.S. was a typical toddler after interviewing his daycare's owner and respite care providers. Regarding S.S.'s development, the foster parents addressed his speech delay and related concerns and he had been discharged from therapy. S.S. had tubes placed in his ears and his adenoids removed. Finally, the report indicated that S.S. and his foster family are bonded and that the foster parents wish to adopt him. The GAL recommended that S.S. stay in his current placement until permanency could be achieved and that the foster parents be considered for adoptive placement.

{¶ 9} On April 18, 2022, LCCS filed a motion for permanent custody. In the motion, LCCS stated that S.S. had been in LCCS custody for 12 or more months of a 22-month consecutive period, that father had no contact with the child, that mother had failed to make any substantial progress on the case plan, was unreachable by the caseworker, and had been removed from the plan in December 2021. LCCS noted that S.S.'s maternal grandfather, K.S., was investigated as a possible placement. It rejected the placement, however, due to K.S.'s lengthy criminal history, including substance abuse and domestic violence.

{¶ 10} At the permanent custody hearing, the family's LCCS caseworker, the GAL, mother, and mother's witness, L.G., testified. The caseworker testified that on the date of the hearing, S.S. was the only family member listed on the case plan. Despite its efforts, LCCS was unable to contact father and he never made himself available to the

4.

agency. In October 2021, mother was removed from the plan because she had not met with S.S. for 60 days. Approximately eight months later, mother reestablished contact with LCCS.

{¶ 11} The caseworker testified that mother obtained two, dual diagnostic assessments. The first in Toledo in February 2021, and the second in Connecticut in July 2021. Mother failed to attend any follow-up services or therapy. The caseworker stated that mother was informed that she needed to stabilize her mental health and medication prior to engaging in the additional case plan services of domestic violence counseling and parenting classes.

{¶ 12} Regarding visitation, the caseworker testified that mother and S.S. had no visits between January and May 2021 and sporadic visits between May and September 2021. There were multiple instances where mother would miss three consecutive visits, have her visits suspended and then reinstated. Between October 2021 and July 2022, mother failed to attend any virtual visits. Father never visited with S.S.

{¶ 13} The caseworker stated that S.S. has been in foster care for one and one-half years and is very bonded with his foster family. The caseworker explained that S.S. is in a very "loving and inviting environment" and that S.S. is developing normally after his foster parents addressed his medical and developmental needs. Attempts to place S.S. with family members was unsuccessful. S.S.'s maternal grandfather had a criminal record, and both maternal grandparents were on child abuse registries.

5.

**{¶ 14}** The caseworker further testified that in June 2022, while the permanent custody motion was pending, mother gave LCCS three additional names to investigate for placement: S.S.'s great-grandmother, his great-uncle, and his uncle. The caseworker contacted all three individuals. Great-grandmother stated that she was uncertain due to her age and S.S.'s age. Great-uncle stated that he works in transportation and his job is not stable enough to have the child. Uncle did not respond.

**{¶ 15}** Thereafter, great-grandmother contacted the caseworker and expressed her interest in adopting S.S. The caseworker informed her that he would give her name to the adoption worker but that legal custody at that point was "inappropriate" because the permanent custody motion was pending. He stated that he explained this to each family member contacted after the permanent custody motion had been filed.

**{¶ 16}** Mother's witness, L.G., then testified by video conference. L.G. stated that in late May or early June 2022, mother contacted her to begin taking parenting classes. L.G. stated that mother attended five sessions and had two more to complete the series. Mother attended all scheduled sessions. L.G. stated that mother's progress was encouraging.

**{¶ 17}** During cross-examination, L.G. admitted her mistaken belief that mother and S.S. had some face-to-face contact. L.G. also admitted having no contact with LCCS.

6.

{¶ 18} Mother next testified that she moved to Connecticut to avoid "trouble with the law" and claimed that she was "laced" or drugged by her boyfriend's friend. Mother stated that she had been trying to get into therapy for a while and had recently begun attending a program called Steps. Mother stated that if she did not regain custody, she wanted LCCS to place S.S. with his maternal great-grandmother.

{¶ 19} The final witness was the GAL assigned to the case. Her testimony aligned with her June 17, 2022 findings and recommendation report filed with the court. The GAL stated that after conducting an investigation in the matter, she believed that permanent custody of S.S. should be awarded to LCCS. The GAL stated that S.S. did not recognize mother during virtual visits. The GAL agreed that there were periods of over 90 days when mother failed to visit S.S.

{¶ 20} The GAL stated that S.S. has a very loving relationship with his foster parents and siblings and that his home environment is nurturing and structured. She testified that the foster parents were "very willing" to adopt S.S.

{¶ 21} During cross-examination, the GAL stated that she had spoken with mother approximately ten times since her move to Connecticut. Mother mentioned relatives she would consider for custody of S.S.; the GAL explained that she did not contact them because LCCS was responsible for investigating potential placements.

{¶ 22} On August 22, 2022, the juvenile court granted LCCS' motion for permanent custody. Applying R.C. 2151.414, the court found there was clear and

7.

convincing evidence that S.S. had been in agency custody for 13 consecutive months, and that he cannot or should not be placed with either parent within a reasonable time. As to mother, the court concluded that mother failed to remedy the conditions that caused S.S.'s removal from the home and that she demonstrated a lack of commitment to S.S. As to mother and father, the court concluded that they abandoned S.S.

{¶ 23} The juvenile court then determined that permanent agency custody was in S.S.'s best interest because he was bonded with his foster parents and siblings. Since his placement in the foster home, S.S. had progressed and successfully completed speech therapy. The foster parents had indicated a desire to adopt S.S.

{¶ 24} The court noted that S.S. had been in LCCS' custody for two-thirds of his life and needed a legally secure placement. Parents had been unable or unwilling to provide a secure home and despite "intensive" efforts from LCCS in locating a relative placement for S.S., none of the identified placements were appropriate. This appeal followed the juvenile court's judgment.

## II. Assignments of Error

{¶ 25} Mother raises the following assignments of error:

> 1. Lucas County Children Services failed to make reasonable efforts when they failed to investigate a possible kinship placement for the child.

2. The CASA/GAL failed to perform her duties as a CASA/GAL failed to do an independent investigation during this case and it was improper for the trial court to rely upon her report.

### III. Law and Analysis

### A. Best Interest and Relative Placement

{¶ 26} In mother's first assignment of error, she argues that the juvenile court erred in finding under R.C. 2151.414(B)(1) that it is in the best interest of S.S. to grant permanent custody to LCCS because the agency failed to investigate maternal great-grandmother as a possible placement for S.S. despite her request for placement and custody of the child.

{¶ 27} A decision to terminate parental rights in a permanent custody case will not be reversed unless it is against the manifest weight of the evidence. *In re L.H.*, 6th Dist. Lucas No. L-22-1078, 2022-Ohio-3263, ¶ 20, citing *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11. Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

9.

**{¶ 28}** "As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony." *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 42. "Thus, 'in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" (Citations omitted.) *Id.*

**{¶ 29}** R.C. 2151.414 sets forth a two-prong analysis the juvenile court must apply when ruling on a motion for permanent custody. *In re R.A.*, 6th Dist. Erie Nos. E-21-048, E-21-049, 2022-Ohio-1748, ¶ 33. "The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency." *In re A.W.*, 6th Dist. Lucas No. L-22-1209, 2023-Ohio-166, ¶ 55. The courts findings under R.C. 2151.414 must be supported by clear and convincing evidence. *In re R.A.* at ¶ 33.

**{¶ 30}** As to the first prong, the juvenile court found that S.S. cannot or should not be placed with either parent, and that he has been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(a), (d). Mother does not challenge these findings on appeal. Rather, she only contests the

10.

juvenile court's determination that the grant of permanent custody to LCCS was in S.S.'s best interest; therefore, resolution of the first assignment of error is limited to this issue.

{¶ 31} In making a best interest determination, a juvenile court is guided by R.C. 2151.414(D)(1), which provides:

{¶ 32} In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child * * *;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

11.

{¶ 33} "In considering the child's best interest, the juvenile court is not required to discuss each of the factors under R.C. 2151.414(D)(1)(a) through (e), and the factors outlined therein are not exhaustive." *In re W.M.* at ¶ 51.

{¶ 34} "[A] court is not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody." *Matter of B.F.*, 5th Dist. Licking No. 19-CA-74, 2019-Ohio-5434, ¶ 40; *see also In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64; *In re A.H.,* 6th Dist. Lucas Nos. L-18-1072, L-18-1074, 2018-Ohio-4381, ¶ 30*; In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 22-23; *In re Grooms*, 2d Clark No. 2003 CA 50, 2004-Ohio-6782, ¶ 21-23; *In re Brown*, 11th Dist. Lake No. 2004-L-027, 2004-Ohio-3337, ¶ 14.

{¶ 35} Mother's argument that maternal great-grandmother was not investigated as a placement for S.S. lacks merit. Noteworthy is the fact that great-grandmother informed LCCS that she would be interested in *adopting* S.S., not obtaining legal custody. Regardless, in satisfying its duty to determine whether permanent custody to the agency is in a child's best interest, the juvenile court was not required to determine whether maternal great-grandmother or any other relative was available for placement.

{¶ 36} After considering each of the best interest factors set forth in R.C. 2151.414(D), the juvenile court concluded that permanent custody of S.S. to LCCS was in his best interest as he had been in agency custody since January 2021, the majority of

12.

his young life, was very bonded to his foster family, and needed a legally secure placement. In making its determination, the court specifically noted that LCCS made "intensive efforts" to locate an appropriate and willing kinship caregiver. Mother failed to demonstrate the juvenile court's decision is against the manifest weight of the evidence, and her first assignment of error is not well-taken.

## B. The GAL's Investigation

{¶ 37} In her second assignment of error, mother argues that the GAL failed to conduct an independent investigation in the matter in contravention of her duties under Sup.R. 48. Mother contends that beyond a virtual visit observation, the GAL failed to conduct any independent investigation as to possible relative placements and just "rubber stamped" LCCS' recommendations. Sup.R. 48.03 relevantly provides:

> (D) Duties of the Guardian Ad Litem. Unless specifically relieved by the court, the duties of a guardian ad litem shall include, but are not limited to, the following:
>
> (1) Become informed about the facts of the case and contact all relevant persons;
>
> (2) Observe the child with each parent, foster parent, guardian or physical custodian;
>
> (3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;

(4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;

(5) Ascertain the wishes and concerns of the child;

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶ 38} The record in this matter reveals that mother failed to raise any argument or cross-examine the GAL regarding her compliance under the rule. Further, courts have consistently held that superintendence rules are administrative directives only and do not create substantive rights. *In re E.S.*, 6th Dist. Ottawa Nos. OT-14-008, OT-14-009, OT-14-011, OT-14-012, 2014-Ohio-3067, ¶ 61. *See In the Matter of Z.S.*, 4th Dist. Jackson Nos. 22CA12, 22CA13, 2023-Ohio-688, ¶ 37.

{¶ 39} Regardless, the GAL in this case fully complied with Sup.R. 48.03. The GAL stated that during the proceedings, she interviewed ten individuals including S.S., mother, foster parents, maternal and paternal grandmothers, day care and respite providers, and LCCS caseworkers. She listed 15 dates of contact with S.S., many of them being in his foster home. The GAL provided a detailed case summary of S.S.'s medical and developmental care and needs and his interactions with mother and his foster family and other caregivers. Her duties under the rule did not require investigating potential relative placements. Mother's second assignment of error is not well-taken.

15.

## IV. Conclusion

**{¶ 40}** For the foregoing reasons, the August 23, 2022 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Pursuant to App.R. 24, mother is ordered to pay the costs of this appeal.

Judgement affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.                               _____
JUDGE

Myron C. Duhart, P.J.

_____
Charles E. Sulek, J.                               JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.